NORANDA EXPLORATION, INC., a Delaware corporation,
Plaintiff-Respondent-Petitioner,

v.

M.E. OSTROM, State Geologist, Bronson C. La Follette,
Attorney General, and Carroll D. Besadny, Secretary
of Department of Natural Resources, Defendants-
Appellants.†

Supreme Court

*No. 81–236. Argued February 28, 1983.—Decided July 1, 1983.*

(Also reported in 335 N.W.2d 596.)

† Motion for reconsideration denied, without costs, on September
19, 1983.

For the plaintiff-respondent-petitioner there were briefs by *C. Gordon Paulson, Edward W. Mouw* and *Korth, Rodd, Mouw, Johnson & Mustacci, S.C.,* and *Sommer & Schroeder, S.C.,* Rhinelander, and oral argument by *Richard Sommer.*

For the defendants-appellants the cause was argued by *Raymond Roder,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

Amicus Curiae brief was filed by *R. Norman Cramer, Jr.*, with whom on the brief was *William H. Mellor III*, acting president and chief legal officer, Denver, Colorado, for Mountain States Legal Foundation and the Minerals Exploration Coalition.

LOUIS J. CECI, J.   This is a review of a decision of the court of appeals, *Noranda Exploration, Inc. v. Ostrom*, 107 Wis. 2d 205, 320 N.W.2d 530 (Ct App. 1982), which reversed a judgment of the circuit court of Oneida county, HONORABLE TIMOTHY L. VOCKE, presiding, declaring sec. 107.15, Stats., unconstitutional. Because we conclude that the provisions of sec. 107.15, requiring public disclosure constitute an unconstitutional "taking" without just compensation, we hold those portions of sec. 107.15 unconstitutional and, therefore, we reverse.

The plaintiff, Noranda Exploration, Inc. (Noranda), is engaged in the business of mineral exploration. Noranda began exploring in Wisconsin in 1972. Companies such as Noranda typically go through several stages in the process of mineral exploration. After examining data in the public records, the explorer will make aerial electromagnetic studies, looking for subsurface anomalies. The explorer must then acquire land position in the area where it has determined that magnetic anomalies exist, by obtaining leases for the property from the landowners. The explorer then does ground surveys to eliminate cultural anomalies. Finally, the explorer drills one or more exploration holes toward the anomalies that have been located by the ground men. These exploration holes yield detailed geologic information about the location, size, and quality of mineral deposits. This final phase of exploration is at the center of the controversy in the case before us. From 1972 to October 31, 1979, Noranda drilled 192 exploratory holes in Wisconsin. During this time, Noranda spent $3,763,478 in Wisconsin. Approximately one-third of this amount was

attributable to the actual drilling of holes. During the same period of time, Noranda expended $1,833,143 exploring for minerals on private property leased from Consolidated Papers, Inc. in Oneida county.

In 1977, the Wisconsin legislature enacted sec. 107.15, Stats.,[1] which requires metallic mineral explorers who

---

[1] Section 107.15, Stats. (1977), provides:

"107.15 Requirements for mineral exploration. (1) LEGISLATIVE PURPOSE. The purpose of this section is to further the public interest in informed decision-making by appropriate state agencies, including the office of the state geologist, which are responsible for mineral, geologic and other earth-related sciences by ensuring that those agencies have as much geological information as possible where such information is relevant to their functions and at the same time protecting proprietary rights in such information.

"(2) DEFINITIONS. In this section:

"(a) 'Exploration' means the onsite geologic examination from the surface of an area by core, rotary, percussion or other drilling, where the diameter of the hole does not exceed 18 inches, for the purpose of searching for metallic minerals or establishing the nature of a known metallic mineral deposit, and includes associated activities such as clearing and preparing sites or constructing roads for drilling.

"(b) 'Licensee' means any person registered to conduct exploration as provided under sub. (3) or licensed to conduct exploration activities by the department of natural resources. If the person is a corporation, 'licensee' includes the parent and any subsidiary or affiliates of the corporation engaged in mining or activities related to mining in this state.

"(c) 'Metalliferous minerals' means naturally occurring minerals which contain metal.

"(d) 'Mining' or 'mining operation' means all or part of the process involved in the mining of metallic minerals, other than for exploration or prospecting, including commercial extraction, agglomeration, beneficiation, construction of roads, removal of overburden and the production of refuse.

"(e) 'Prospecting' means engaging in the examination of an area for the purpose of determining the quality and quantity of minerals, other than for exploration but including the obtaining of an ore sample, by such physical means as excavating, trenching, construction of shafts, ramps and tunnels and other means, other

are licensed pursuant to sec. 144.832(2),[2] to disclose certain geologic data acquired in the course of exploring for

than for exploration, which the depatment, by rule, identifies, and the production of prospecting refuse and other associated activities.

"(3) REGISTRATION. Every person who desires to engage in exploration shall register with the state geologist on forms provided by him or her prior to commencing the exploration unless the person has been licensed to conduct exploration activities by the department of natural resources under ch. 144.

"(4) RELEASE OF GEOLOGIC DATA. (a) The licensee shall submit to the state geologist a report containing the following information on or before July 1 of the year following each year in which soil, rock, core or drill cutting samples are obtained by the licensee:

"1. The name and address of the person conducting exploration and, if the person is a corporation, the names and addresses of the parent and any subsidiaries or domestic affiliates of the corporation engaged in exploration activities in this state;

"2. The names and addresses of the owners of the lands in this state on which exploration activities have been conducted;

"3. The specific location, inclination and the collar azimuth of completed drill holes;

"4. The date core samples and drill cuttings which have been collected or prepared, were obtained;

"5. The approximate elevation of the collars of drill holes;

"6. The percent core recovery log; and

"7. A noninterpretive lithologic description of all portions of core samples and, of all drill cuttings if any noninterpretive lithologic descriptions of drill cuttings are prepared, excluding mention of metalliferous minerals found in the samples and cuttings.

"(b) The state geologist may require that designated representative and reasonable quantities of soil, rock, core or drill cutting samples obtained by a licensee during exploration be retained by the licensee and released to the state geologist for purposes of geologic study. The state geologist shall designate the samples and the quantities to be retained by the licensee and shall notify the licensee by December 31 of the year in which a report under par. (a) is submitted. The licensee shall release the samples no later than July 1 of the year following the year in which an exploration lease for the site where the samples were obtained has expired, but release shall be no later than 10 years after the commencement of drilling at the site.

minerals within the state and to provide samples of certain materials obtained during exploration.  Section 107.-

"(c) The state geologist or his or her designee may visually examine, at reasonable hours mutually agreed upon by the licensee and the state geologist, core samples or drill cuttings which are reported on under par. (a), except for those core samples or drill cuttings or portions of core samples or drill cuttings which the licensee deems proprietary or confidential.

"(d) No later than upon the termination of mining or the abandonment of a site subsequent to prospecting, or 10 years from the date core samples or drill cuttings were originally obtained, the licensee shall submit to the state geologist, if not previously submitted, the following noninterpretive geologic information and samples:

"1. The name and address of the person conducting exploration and, if the person is a corporation, the names and addresses of the parent and any subsidiaries or domestic affiliates of the corporation engaged in exploration, prospecting or mining in this state;

"2. The names and addresses of the owners of the lands in this state on which exploration activities have been conducted;

"3. The specific location, inclination and the collar azimuth of completed drill holes;

"4. A noninterpretive lithologic description of all portions of core samples and, of all drill cuttings if any noninterpretive lithologic descriptions of drill cuttings are prepared, excluding mention of the quantity of metalliferous minerals found in the samples and cuttings;

"5. Geologic maps of a lithologic nature of a scale smaller than one inch equals 200 feet normally prepared as a permanent record of an exploration, prospecting or mining operation;

"6. The date core samples and drill cuttings were obtained;

"7. The approximate elevation of the collars of drill holes;

"8. The percent core recovery log; and

"9. Upon the request of the state geologist, a representative sample of any core samples or drill cuttings which have been collected.

"(e) The information submitted to the state geologist under par. (a) or (d) may not be used by any person as the basis for any claim of civil liability which is unrelated to metalliferous mineral mining.  Any person submitting information in good faith and in

15, also provides that the exploration data and samples submitted to the state geologist shall be kept confidential

compliance with this section shall not be held responsible for any consequences of the use or reliance upon such information.

"(f) Exploration data and samples submitted under par. (a) or (b), or both, shall be kept confidential until December 31 of the 3rd year following the date of submission. The confidentiality of the data and samples obtained during prospecting or mining shall extend to the time of the abandonment of a site subsequent to prospecting, the termination of mining if mining occurs, or 10 years after the core samples or drill cuttings were obtained, whichever is earliest.

"(5) FEES. The state geologist shall charge a reasonable fee to persons requesting copies of any written information collected or prepared under this section. A person employed by a state agency shall not be charged for such information if the information requested is necessary for the performance of the person's duties.

"(6) PENALTIES. (a) Any person who knowingly or willfully fails to comply with the reporting requirements of this section shall be fined up to $50,000.

"(b) In addition to the penalty prescribed in par. (a), any person who fails to submit information which is required to be submitted under this section shall forfeit $10 for each day after the date on which the information should have been submitted until the information is provided.

"(c) Any person who knowingly or wilfully violates the confidentiality requirements of this section shall be fined not less than $50 nor more than $50,000, or be imprisoned for not less than one month nor more than 6 months, or both. This paragraph shall not prevent the use of the confidential information:

"1. For assessment purposes under s. 36.25 (6) ; or

"2. By the secretary of the department of natural resources for purposes of specific environmental analysis and permit application evaluation and by the secretary of the department of revenue provided that the confidential information shall not be released by either the department of revenue or the department of natural resources, that the departments of revenue and natural resources shall establish procedures to keep any confidential information confidential, and that the responsible person or persons in each department shall be subject to the penalty specified under this paragraph for the unauthorized release of confidential information."

until December 31 of the third year following the date of submission. Section 107.15(4)(f).

Noranda commenced this action in the circuit court on July 2, 1979. In its complaint, Noranda alleged that it had vested title to the information obtained during the course of the exploration activities, that the information was of extreme value to Noranda, and that the value of the information would be substantially reduced if it were disclosed to other persons. The complaint alleged that, in its effect, sec. 107.15, Stats., constitutes a taking of Noranda's property without just compensation,[3] violates its rights to procedural due process and equal protection, and constitutes an impairment of contract rights. Noranda asked the court to declare sec. 107.15 unconstitutional and to issue a temporary restraining order against the enforcement of the provisions of secs. 107.15 and 144.832(5).[4] The trial court issued a temporary restrain-

The effective date for sec. 107.15, Stats., was June 3, 1978. While the 1977 statutes are referred to in this opinion, the current language in all sections cited is substantially the same.

[2] Section 144.832(2), Stats., which was enacted contemporaneously with sec. 107.15, requires all persons who intend to engage in metallic mineral exploration in Wisconsin to be licensed by the department of natural resources (DNR).

Noranda applied for and was granted a Metallic Mineral Exploration License on September 8, 1978.

[3] Amendment V of the United States Constitution reads in pertinent part:

". . . nor shall private property be taken for public use without just compensation."

Article I, sec. 13 of the Wisconsin Constitution provides as follows:

"**Private property for public use.** SECTION 13. The property of no person shall be taken for public use without just compensation therefor."

[4] Section 144.832(5), Stats. (1977), provides:

"LICENSE REVOCATION. The department may revoke or suspend an exploration license issued under this section if it determines, after hearing, that:

ing order and, following a hearing, granted Noranda's motion for a temporary injunction.

The statutory scheme involved is somewhat complex. The purpose of sec. 107.15, Stats. (1977), is stated in sub. (1):

". . . The purpose of this section is to further the public interest in informed decision-making by appropriate state agencies, including the office of the state geologist, which are responsible for mineral, geologic and other earth-related sciences by ensuring that those agencies have as much geological information as possible where such information is relevant to their functions and at the same time protecting proprietary rights in such information."

Section 107.15(2), Stats., is the definitional section.[5] Section 107.15(4), provides that a licensee shall provide the state geologist with certain geologic data, including:

"[a] noninterpretive lithologic description[6] of all portions of core samples and, of all drill cuttings if any noninterpretive lithologic descriptions of drill cuttings are prepared, excluding mention of metalliferous minerals found in the samples and cuttings." Section 107.15(4) (a) (7), Stats. (1977).

This data is to be submitted to the state geologist on or before July 1 of the year following each year in which

---

"(a) Statutes or rules of the department have not been complied with; or

"(b) There has been a failure to increase bond amounts to adequate levels as specified by the department."

[5] *See*, note 1.

[6] A noninterpretive lithologic description is "noninterpretive" in the sense that it does not provide information concerning the origin of the rock layers it describes and, therefore, does not, by itself, indicate the presence of metallic minerals. Essentially, it describes the nature of the rock layers through which the drill has passed. Noranda produced evidence at trial which indicated that such data could be valuable information in the hands of a competent geologist.

soil, rock, core or drill cutting samples are obtained by the licensee. Section 107.15 (4) (a).

In addition, sec. 107.15 (4) (b), Stats. (1977), provides that the explorer may be required to submit core samples to the state geologist:

"The state geologist may require that designated representative and reasonable quantities of soil, rock, core or drill cutting samples obtained by a licensee during exploration be retained by the licensee and released to the state geologist for purposes of geologic study. The state geologist shall designate the samples and the quantities to be retained by the licensee and shall notify the licensee by December 31 of the year in which a report under par. (a) is submitted. The licensee shall release the samples no later than July 1 of the year following the year in which an exploration lease for the site where the samples were obtained has expired, but release shall be no later than 10 years after the commencement of drilling at the site."

Section 107.15 (4) (f), Stats., provides for the confidentiality until December 31 of the third year following the date of submission of the exploration data and samples submitted under (4) (a) or (b). Thus, the exploration data will not be released to the public for at least three and one-half years, and core samples might be kept confidential for as many as thirteen and one-half years. Section 107.15 (6) (c), imposes penalties upon those who knowingly or wilfully violate its confidentiality requirements, but it permits the state geologist to provide the department of natural resources and the department of revenue with the confidential information. Both the department of natural resources and the department of revenue are required to establish procedures to maintain the confidentiality of the information they receive.

Following the six-day trial which took place in January and February of 1980, the trial court declared sec. 107.15, Stats., to be unconstitutional and ordered that the de-

fendants be permanently enjoined from enforcing the statute.

The trial court concluded that, beyond a reasonable doubt, the statute deprived Noranda of its property without due process of law and impaired Noranda's contract obligations to property owners whose land Noranda was exploring.

The trial court made several findings. It found that the information obtained by the process of exploration had value to the explorer and to the landowner from whom the explorer obtains a lease and that the person doing the exploring expects to have a proprietary right in the information obtained. The court found that the intrinsic value of the core sample extends indefinitely, and the period of exploration may legitimately be longer than thirteen and one-half years. It also found that even though a reading of a truly nondescriptive lithologic log would only indicate that a particular area's environment was favorable for minerals, it was clear that the value of the information to the company acquiring it would dissipate upon the disclosure of the information to competitors. The court found that the state had other means of obtaining the information which it felt was necessary to protect the public health and welfare and that the information required under sec. 107.15, Stats., was not necessary to protect the health, safety, and welfare of the public.

The trial court noted that the burden of proof is on the party who attacks the constitutionality of a statute and that to prevail, the plaintiff must show that there is no rational relationship between the law and a legitimate government interest. Nevertheless, the court concluded:

"[B]ased upon the testimony, beyond any reasonable doubt it has been shown that the operation of *s. 107.15 Wis. Stats.* is, in fact, a taking of property and that the State acquires, seizes, takes into possession, gains and

assumes ownership of the property developed by and owned by a private corporation." (Emphasis supplied.)

The court of appeals reversed the trial court and dissolved the injunction barring the enforcement of the statute. The court concluded that sec. 107.15, Stats., is a valid exercise of the state's police power that does not take property without due process of law and that, as a valid exercise of the police power, sec. 107.15, may constitutionally attach subsequent conditions to the contracts it affects. Unlike the trial court, the court of appeals determined that the evidence presented at trial showed that sec. 107.15, has a reasonable and rational relationship to the furtherance of the public welfare. The court concluded that the record did not support a finding that the statute's reporting requirements would render the disclosed information useless to Noranda for all practical purposes.

The court of appeals rejected Noranda's impairment of contract claim, stating:

"Contracts 'will be subject to a law of the state enacted after the bargain if it is in the public interest, under the police power, to attach subsequent conditions to the contract.' *State ex rel. Building Owners & Managers Ass'n of Milwaukee, Inc. v. Adamany,* 64 Wis. 2d 280, 294, 219 N.W.2d 274, 281 (1974)." 107 Wis. 2d at 213.

The court also rejected procedural due process and equal protection arguments advanced by Noranda.

The general rule has evolved from United States Supreme Court decisions since the turn of the century that compensation is required for a governmental "taking" of property and not for losses occasioned by mere governmental regulation. *See, e.g., Penna. Coal Co. v. Mahon,* 260 U.S. 393 (1922) ; *Penn Central Transp. Co. v. New York City,* 438 U.S. 104 (1978) ; *Goldblatt v. Hempstead,* 369 U.S. 590 (1962) ; *United States v. Causby,* 328 U.S. 256 (1946). However, a regulation may be so

onerous that it constitutes a taking. *Penna. Coal v. Mahon,* 260 U.S. 393.

The problem of how to distinguish between an unconstitutional taking and a police power regulation is a difficult one, and the decisions of the Supreme Court have not made it less difficult. Decisions in this area of the law must necessarily be made on an ad hoc basis. As the U.S. Supreme Court has stated:

> "The question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty. While this Court has recognized that the 'Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole,' *Armstrong v. United States,* 364 U.S. 40, 49 (1960), this Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. See *Goldblatt v. Hempstead,* 369 U.S. 590, 594 (1962). Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely 'upon the particular circumstances [in that] case.' *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168 (1958) ; see *United States v. Caltex, Inc.,* 344 U.S. 149, 156 (1952)." *Penn Central v. New York City,* 438 U.S. at 123–24.

At the outset, it is necessary to address the state's contention that Noranda did not have a property right in the exploration data and core, the "taking" of which would be a violation of substantive due process. The state argues that since sec. 107.15, Stats., affects only drill core obtained after its passage, and since the drilling is entirely voluntary, there is no vested property right in either the core or the data.

As this court has stated:

"Whether a right is a property right afforded protection by the Constitution of the United States is primarily dependent upon whether the right or interest has been recognized and protected by state law." *Riedy v. Sperry*, 83 Wis. 2d 158, 164, 265 N.W.2d 475 (1978).

We believe that this threshold concept is satisfied in the case before us. It is clear that a mineral explorer in Wisconsin has a protectible property right in the core samples and information it has gathered; the legislature has explicitly recognized such a property interest in the language of sec. 107.15, Stats.:

"The purpose of this section is to further the public interest in informed decision-making by appropriate state agencies . . . and *at the same time protecting proprietary rights in such information.*" (Emphasis added.)

Nevertheless, the state argues that the scope of this property right is also limited by the statute to the extent that when the exploration data and drill core samples are acquired by the state, there is no "taking" in the constitutional sense, even though Noranda's exploration was done on privately owned rather than state-owned land. We disagree. As the U.S. Supreme Court stated in *Loretto v. Teleprompter Manhattan CATV Corp.*, 102 S. Ct. 3164, 3178 (1982), "government does not have unlimited power to redefine property rights."[7] In *Loretto*, the state of New York argued that a statute had amended property rights by requiring that building owners allow a cable television company to physically locate wires on their buildings. Even though Loretto

---

[7] *See also, Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 164 (1980), in which the Court held that "a State, by *ipse dixit*, may not transform private property into public property without compensation."

purchased the building after the statute became effective, the Court found that a "taking" had occurred. Thus, we agree with Noranda that although a state may redefine property rights to a limited extent, it lacks the power to restructure rights so as to interfere with traditional attributes of property ownership, such as the right to exclude others.

Having determined that Noranda has a protectible property right, the first question to be addressed in deciding the constitutionality of the public disclosure requirements of sec. 107.15, Stats., is whether the statute is a legitimate exercise of the police power.[8]

To be a valid exercise of the state's police power, a statute must have a reasonable and rational relationship to the furtherance of a proper legislative purpose. *State v. Jackman,* 60 Wis. 2d 700, 704–05, 211 N.W.2d 480 (1973); *Chicago & N.W. Ry. v. LaFollette,* 43 Wis. 2d 631, 646–47, 169 N.W.2d 441 (1969). Under the police power analysis, sec. 107.15, Stats., is presumed to be constitutional, and Noranda must prove its invalidity beyond a reasonable doubt. *Chicago & N.W. Ry.,* 43 Wis. 2d at 647; *State ex rel. Hammermill Paper Co. v. La Plante,* 58 Wis. 2d 32, 46, 205 N.W.2d 784 (1973). In making this determination, it is the function of the reviewing court to consider the facts—not to weigh the evidence in the traditional sense, but to determine whether the legislation is without reasonable basis.

This court must first examine the purposes of the legislation. The stated purpose of sec. 107.15, Stats., is:

> "to further the public interest in informed decision-making by appropriate state agencies . . . and at the same time protecting proprietary rights in such information." Section 107.15 (1), Stats.

---

[8] Noranda also challenges the constitutionality of the provisions which require a mineral explorer to submit the geologic data to the state. We feel that the statute's major infirmity is the inadequacy of its confidentiality provisions.

Sections 107.15(6)(c)1 and 2 provide that the confidential information may be used by the department of revenue for tax assessment purposes under sec. 36.25(6), and by the secretary of the department of natural resources "for purposes of specific environmental analysis." Noranda does not dispute that these are proper legislative goals; it contends that the statute, if it advances these goals at all, advances them slightly, not substantially. We agree.

In *Chicago & N.W.R. Co. v. La Follette,* 27 Wis. 2d 505, 529, 135 N.W.2d 269 (1965), we stated:

" 'When the result is reached, if it is found the statutory protection is of such slight consequence, or is so incidental as to cause the provisions of the [statute] to be wholly impractical, and not in promotion of the safety it seems to strive for, then its operation would be unreasonable and arbitrary.' " (Citing *Pennsylvania R. Co. v. Driscoll,* 330 Pa 97, 104, 198 A. 130 (1938).)

We conclude that the disclosure of the confidential information to the public at large bears no reasonable relationship to:

". . . informed decision-making by appropriate state agencies . . . which are responsible for mineral, geologic and other earth-related sciences by ensuring that those agencies have as much geologic information as possible . . ." Section 107.15(1), Stats.

Moreover, this lack of rational relationship between the legislation's means and its goals is not cured by the periods of confidentiality provided for. As the trial court found, the information that is obtained by the explorer has a continuing value as a reference material in the explorer's "library,"[9] and:

---

[9] The trial court found that exploration companies commonly are secretive in the predrilling activities, and they keep almost all of the predrilling information they obtain confidential. "Clearly exploration companies would prefer the competitors not knowing

" 'the information obtained by the explorer will have a negative value if turned over to the explorer's competition; that is, disclosure will make the information available to the competitor who will have to expend virtually no money to receive the information; and by receipt of the disclosed information the competitor will be at a substantially more competitive level without making a substantial outlay of capitol [sic].' "

The nature of the industry is such that neither the three-year nor the thirteen-year period of confidentiality is adequate to ensure that the explorer retains the benefits which result from the confidentiality of the information. The intrinsic value of the core extends indefinitely, and the period of exploration may legitimately be longer than thirteen and one-half years. One reason for this is that the value of mineral discoveries depends largely upon the world's mineral market; even though a company may have found a mineral deposit in an area, it may not be economically feasible to mine for it immediately.

As we have previously noted, courts engage in "essentially ad hoc, factual inquiries" in determining whether a governmental regulation or restriction is a valid exercise of the police power or is an unconstitutional taking without just compensation. *Penn Central v. New York City*, 438 U.S. at 124. A taking may more readily be found when the interference with property can be characterized as a physical invasion by government. *Id.; see, e.g., United States v. Causby*, 328 U.S. 256. At the other end of the spectrum are cases in which courts have concluded that the public health, safety, morals, or general welfare would be promoted by prohibiting particular contemplated uses of land. In such situations, regulations

---

where they are drilling. Core is the most important product that an exploration company produces and develops as the foundation of its latest mining potential and it is in a sense the company geologist's 'library.' "

have usually been upheld. *See, Euclid v. Ambler Co.*, 272 U.S. 365 (1926); *Gorieb v. Fox*, 274 U.S. 603 (1927); *Welch v. Swasey*, 214 U.S. 91 (1909).

However, the case before us is not a zoning case, nor is the state geologist regulating mineral exploration by sec. 107.15 to prevent harm arising from exploration. Rather, the instant case involves the state's acquisition of a private citizen's property, and the distribution of that property (after the period of confidentiality ends) to other private citizens for their benefit. In such a case, the usual "police power" "balancing" analysis is not appropriate, since the government's acquisition of private property is in some ways more closely akin to a permanent physical occupation of property, which the U.S. Supreme Court has held is always compensable. *Loretto v. Teleprompter*, 102 S. Ct at 3171. In Noranda's situation, as in *Loretto*, a "taking" does not become a noncompensable exercise of police power simply because the state allows the owner to make some "reasonable" use of that property. We believe that the character of the governmental activity is the controlling factor here; sec. 107.15 authorizes a government intrusion of a serious character. In *Loretto*, the Supreme Court did not dispute the lower court's determination that the statute served a legitimate public purpose and was within the state's police power. However, the Court stated that it was:

" 'a separate question . . . whether an otherwise valid regulation so frustrates property rights that compensation must be paid.' " 102 S. Ct. at 3170–71.

Under the court of appeals' rationale, almost any infringement upon private property rights would be upheld so long as there existed any possible reasonable relationship between the governmental activity and a patently permissible legislative goal. This, we believe, is an unduly expansive interpretation of the state's police power.

Accordingly, we hold that the provisions of sec. 107.15, which provide for disclosure to the public of confidential mining exploration data and core samples, amount to an unconstitutional taking of private property without just compensation.[10]

*By the Court.*—The decision of the court of appeals is reversed.

SHIRLEY S. ABRAHAMSON, J. (*dissenting*). The majority declares unconstitutional the public disclosure provisions of sec. 107.15. It holds that the disclosure provisions constitute a taking of property without just compensation.[1] It then holds that they deprive Noranda of property without due process of law because there is no rational relationship between the disclosure provisions and a legitimate government interest.[2] I dissent from both of these conclusions.

I acknowledge that the information subject to disclosure in this case[3] can be classified as property, and I agree with the majority that the question of what constitutes taking is a problem of considerable difficulty which "the decisions of the Supreme Court have not made . . . less difficult." *Supra,* p. 624.[4] Although the test for

---

[10] Because of our holding on the substantive due process issue, we do not find it necessary to address the other possible bases for a finding of unconstitutionality which Noranda argued.

[1] The fifth amendment of the United States Constitution (made applicable to the state by the fourteenth amendment) and art. I, sec. 13, of the Wisconsin constitution guarantee that private property shall not "be taken for public use without just compensation."

[2] Fourteenth amendment of the United States Constitution and art. I, sec. 1, of the Wisconsin constitution.

[3] My understanding is that the core sample and the noninterpretive lithologic log excluding mention of metalliferous minerals together constitute the property "taken."

[4] For an interesting discussion of constitutional constraints upon the federal government's disclosure of business information under the freedom of information act, see Connelly, *Secrets and*

assessing when a taking has occurred can not be stated as a set formula, the United States Supreme Court has concluded that a court deciding whether a particular state action constitutes a taking must, as the majority recognizes, engage in "essentially ad hoc, factual inquiries." *Supra*, p. 628. These factual inquiries are made within the context of determining "whether the interference with [the] property is of such a magnitude that 'there must be an exercise of eminent domain and compensation to sustain [it] [*sic*].' *Pennsylvania Coal Co. v. Mahon*, 260 U.S. [393], at 413 [1922]." *Penn. Central Transp. Co. v. New York City*, 438 U.S. 104, 136 (1978). In making its inquiries, the court must focus both on the "character of the action and on the nature and extent of the interference with rights in the parcel as a whole. . . ." *Penn. Central Transp. Co. v. New York City*, 438 U.S. 104, 130–31 (1978). The test then is essentially a balancing test dependent on the facts of the particular case, necessarily requiring a "careful assessment of the impact of the regulation" on the property in question, *id.* at 136, and designed to produce a fair and equitable distribution of the burdens and benefits of enforcing a government policy. *Id.* at 123, 133. P. 624.

This court has discussed this balancing test in similar terms. In *Just v. Marinette County*, 56 Wis. 2d 7, 15, 201 N.W.2d 761 (1972), we said that the distinction between a permissible regulation and an unconstitutional taking is not a "bright line," but turns on the degree of damage that the property owner suffers because of the regulation; "[t]he loss caused the individual must be weighed to determine if it is more than he [or she] should bear."

The circuit court's 48-page decision and the extensive record consisting of several boxes of transcripts and exhibits from the seven-day trial of this case reveal that the parties and the circuit court recognized that resolu-

tion of the constitutional issue depends upon an empirical demonstration that the statute's impact on the property is so great that it constitutes a taking. *See* Hurst, *Dealing with Statutes* 81–86, 95–98 (1982).

The circuit court found that the intrinsic value of the core sample extends indefinitely; that the period of exploration may legitimately be longer than thirteen and one-half years; that the value of the information to the company acquiring it could dissipate upon the disclosure of the information to competitors; that although the disclosure of the information reduces its value to the exploration company, it does not entirely eliminate its value to them; and that even after disclosure, the information will still be more valuable to the company that originally produced it than to the competitor.

The majority, without close analysis of the facts, concludes that the facts show that the statutory confidentiality periods "are not adequate to ensure that the explorer retains the benefits which result from the confidentiality of the information," *supra,* p. 628, implying that disclosure totally destroys the value of the property because it is like a "permanent physical occupation of property, which the U.S. Supreme Court has held is always compensable." *Supra,* p. 629. I am not convinced. Disclosure after the period of confidentiality may diminish the value of property but diminution in value does not necessarily constitute a taking.

The majority also holds that the disclosure provisions are unconstitutional because they are not a valid police power regulation. I agree with the majority that "to be a valid exercise of the state's police power, a statute must have a reasonable and rational relationship to the furtherance of a proper legislative purpose." Even Noranda concedes that the statute has a proper legislative purpose and that "[i]t cannot be seriously contested that the statute does serve some state interests. . . ." Noranda's only contention is that the statute "does not *substantially*

*advance* that purpose and in fact impedes such purposes." Petitioner's brief, p. 15.

The majority, following Noranda's arguments, implicitly evaluates the statute to determine how well the legislature has met its goals. This court, however, has rejected this approach, stating that the court does "not sit as judges of the merits of the controversy. . . . Courts are not concerned with the overall merits or wisdom of statutes." *Chicago & N.W.R. Co. v. La Follette,* 27 Wis. 2d 505, 521, 135 N.W.2d 269 (1965).

The principle controlling judicial review under the rational basis test is that the court determine whether there may be facts which the legislature could have deemed to exist and which would form a reasonable basis upon which the statute may constitutionally rest. Sometimes the facts are such that the court may take judicial notice of them. Where economic regulation is involved, it may be necessary for the facts to be presented to the trial court in an evidentiary hearing. *Chicago & N.W.R. Co. v. La Follette,* 27 Wis. 2d 505, 523–24, 135 N.W.2d 269 (1965) ; Hurst, *Dealing with Statutes* 95–98 (1982).

I am not persuaded, beyond a reasonable doubt,[5] that the disclosure provisions of this statute violate due process. I would affirm the decision of the court of appeals.

I am authorized to state that JUSTICE NATHAN S. HEFFERNAN joins in this dissent.

---

[5] The general rule applicable to judicial review of a police power statute is that there is a presumption of constitutionality and the burden is on the challenger to prove unconstitutionality beyond a reasonable doubt. It is not clear that the same presumption and burden should apply to a challenge under the taking provisions of the constitutions. *See* Hurst, *Dealing with Statutes* 87–106 (1982).