STATE of Alaska, DEPARTMENT OF NATURAL RESOURCES; and Alaska Oil and Gas Conservation Commission, Appellants,

v.

ARCTIC SLOPE REGIONAL CORPO-RATION, an Alaska corporation, Appellee/Cross–Appellant,

and

Standard Alaska Production Company, a Delaware corporation; and Chevron U.S.A. Inc., a Pennsylvania corporation, Appellees/Cross–Appellants.

Nos. S–3400, S–3416 and S–3437.

Supreme Court of Alaska.

Nov. 22, 1991.

Motion to Stay Judgment Denied April 29, 1992.

Robert E. Mintz, Asst. Atty. Gen., Anchorage, and Douglas B. Baily, Atty. Gen., Juneau, for appellants State of Alaska, Dept. of Natural Resources and Alaska Oil and Gas Conservation Com'n.

Stephen M. Ellis and Marc D. Bond, Delaney, Wiles, Hayes, Reitman & Brubaker, Inc., Anchorage, for cross-appellants Chevron U.S.A. Inc. and Standard Alaska Production Co.

David C. Crosby, Council & Crosby, Juneau, and Steven T. Seward and James Wickwire, Wickwire, Greene & Seward, Se-

attle, Wash., for appellee Arctic Slope Regional Corp.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE and COMPTON, JJ.

## OPINION

COMPTON, Justice.

In this appeal we are asked to decide whether the statutory requirement that oil drillers submit well data to the Department of Natural Resources constitutes an unconstitutional taking of property. We conclude that it does not; therefore, we reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A. State Regulation of Oil and Gas Activities

The drilling for and production of oil and gas in Alaska was first regulated under the Alaska Oil and Gas Conservation Act of 1955 (Act). §§ 47–7–1 to 47–7–15 Alaska Compiled Laws Annotated (ACLA) (Supp. 1958). This statute created an Alaska Oil and Gas Conservation Commission to implement the provisions of the Act. § 47–7–3 ACLA (Supp.1958). The commission had the authority to: (1) regulate, for conservation purposes, the drilling, producing and plugging of wells, the spacing of wells, and the disposal of oil field wastes; and (2) require the filing of well data. § 47–7–4 ACLA (Supp.1958). The commission would keep the logs of exploratory or "wildcat" wells confidential for six months unless the owner had given written permission to release the data at an earlier date. *Id.* Section 47–7–4 of the territorial statutes contained no provision for an extended period of confidentiality.

When Alaska became a state in 1959, the territorial conservation act continued in force as state law pursuant to article XV, section 1 of the Alaska Constitution, and was later codified at AS 31.05. The regulations previously promulgated by the commission were placed in the Alaska Administrative Code (AAC) and are currently codified at 20 AAC 25.005–.570. A new Department of Natural Resources (DNR) replaced the Oil and Gas Conservation Commission. Ch. 64, §§ 16, 27, SLA 1959. The State Organization Act vested DNR "with the duties, powers, and responsibilities involved in the administration of the entire state program for the conservation and development of the State's natural resources including ... petroleum and natural gas...." Ch. 64, § 16, SLA 1959. DNR has undergone several internal reorganizations since statehood; its oil and gas related functions are currently concentrated in its Division of Oil and Gas.

In addition to inheriting the regulatory functions previously performed by the commission, DNR became the proprietor of the lands to be transferred to the new state. DNR's Division of Oil and Gas continues to lease the state's land for exploration and development and to ensure that the financial, as well as the environmental, terms of the leases are met. In 1978, however, responsibility for administering AS 31.05 was transferred from DNR to a new Alaska Oil and Gas Conservation Commission (AOGCC). Ch. 158, § 1, SLA 1978. In proceedings before AOGCC, DNR has the same standing as granted by law to any other proprietary interest. AS 31.05.026(e).

DNR nonetheless maintains a role under the Act's provision governing oil and gas well data filed by operators. Alaska Statute 31.05.035(a) provides:

For all wells for which a permit to drill has been issued by the commission since January 3, 1959, the commission may require:

(1) the making and filing of reports, well logs, drilling logs, electric logs, lithologic logs, directional surveys, and all other subsurface information on a well drilled for oil or gas, or for the discovery of oil or gas, or for geologic information; and

(2) the filing of flow test information and all logs, except experimental logs and velocity surveys run on a well and not required by (1) of this subsection;

(3) the operator to make available for copying the digitized log information, if

it is available, on any log required to be filed under (1) or (2) of this subsection.

Alaska Statute 31.05.035(c) requires private oil explorers to disclose to DNR the results of oil well tests in order to avoid public release of the information by the AOGCC following a statutory 24–month confidentiality period.[1] This provision for an extended period of confidentiality was adopted in 1978. Ch. 160, § 5, SLA 1978.

## B. The "KIC" Well

On April 24, 1986, Chevron U.S.A., Inc. (Chevron) completed an exploratory drilling operation known as the "KIC" well on land owned by the Arctic Slope Regional Corporation (ASRC) adjacent to the Arctic National Wildlife Refuge (ANWR).[2] The well was drilled to a depth of 15,193 feet and cost in excess of $40 million. The drilling generated substantial information about the subsurface geology in the ANWR area. The well is of particular value because it is the only onshore well ever drilled east of the Canning River on Alaska's North Slope, and three-fourths of the land located within three miles of the well is unleased.

Pursuant to AS 31.05.035 and 20 AAC 25.071, Chevron filed confidential reports and information concerning the KIC well with AOGCC. The data was due to be released to the public when the 24–month confidentiality period expired on May 24, 1988, unless the period was extended pursuant to AS 31.05.035(c). Although most of the land in the vicinity of the KIC well is unleased, Chevron and Standard did not request DNR to extend confidentiality for the data. Instead, on April 21, 1988, Chevron, Standard, and ASRC (collectively "the companies") filed a lawsuit against DNR and AOGCC in superior court, seeking a

declaration that the disclosure provisions of AS 31.05.035(c) were unconstitutional and an injunction barring AOGCC from releasing the KIC well data either to DNR or to the public.

## C. The Superior Court Proceedings

The superior court granted the companies' motion for a preliminary injunction. They then filed a motion for summary judgment. Although the other parties did not move for summary judgment, all agreed that it was appropriate for the court to decide the case based on the evidentiary record without need for trial. In a lengthy memorandum, the superior court invalidated AS 31.05.035(c) and issued a permanent injunction barring the AOGCC from disclosing the KIC well data to either DNR or the public.

The court held first that challenges to that portion of AS 31.05.035(c) which would entail disclosure to the public were not ripe for adjudication. The court saw only two circumstances under which a public release would occur. If DNR determined that extended confidentiality was called for, then the well data could not be made public until all unleased land within a three-mile radius was leased. Since the KIC well lies within an inholding in ANWR, the court reasoned that such an occurrence "may take years to pass or ... may never pass at all," since an act of the United States Congress would be required for oil and gas production to occur in ANWR. Alternatively, public release could occur if DNR determined that the well data contained no "significant information relating to the valuation of unleased land in the same vicinity." However, DNR stipulated that it would provide the drillers with "advance notice and an

---

1. AS 31.05.035(c) provides:

 The reports and information required in (a) of this section shall be kept confidential for 24 months following the 30–day filing period unless the owner of the well gives written permission to release the reports and information at an earlier date. If the commissioner of natural resources finds that the required reports and information contain significant information relating to the valuation of unleased land in the same vicinity, the commissioner shall keep the reports and information

 confidential for a reasonable time after the disposition of all affected unleased land, unless the owner of the well gives written permission to release the reports and information at an earlier date.

2. ASRC owns only the subsurface estate which it has leased to Chevron and Standard Alaska Production Company (Standard). The surface estate of the lands on which the well is located is owned by Kaktovik Inupiat Corporation—hence the acronym "KIC."

opportunity to challenge any adverse significance determination."

The court found next that the required release of the well data to DNR would constitute a regulatory "taking." The court framed the question as

whether the release of the KIC well data ·from [AOGCC] to DNR, for DNR's own internal, proprietary use, would constitute a governmental "taking" of private property for public purposes, thereby requiring just compensation therefor, or whether such action would qualify as the lawful exercise of· governmental police powers which, in turn, would have some unintended, adverse economic impact on plaintiffs, for which no compensation would be required.

The court noted that it had not been disputed that the drillers possessed a property right in the well data and that "if given access to the KIC well data, DNR would use the information for numerous internal, proprietary and land-management related purposes." It also found that disclosure would adversely affect the economic value of the well data.

The superior court concluded that such diminution in value could not be justified as an exercise of the state's police powers since "DNR is not essentially engaged in the regulation of health, safety and environmental matters." According to the court, DNR is "predominantly involved in the management and development of lands" and stands on the same footing as plaintiff ASRC for "[b]oth wish to promote the leasing and development of their land and valuable subsurface resources." The court rejected DNR's argument that promotion of the state's economic well-being is a noncompensable exercise of government police powers. In the words of the superior court, "The enhancement of the government's own financial interests, occasioned by the acquisition and use of plaintiff's confidential drilling information, to plaintiff's economic disadvantage, is not, in this Court's view, a legitimate state interest."

In creating a remedy, the court found that the taking had not yet occurred since DNR had not yet seen the well data. The court also found that the state did not contemplate paying any compensation (or indeed any cost at all, given the zero fiscal note) in connection with implementation of AS 31.05.035(c). Relying on *State v. University of Alaska,* 624 P.2d 807, 815–16 & n. 13 (Alaska 1981), the court held that the proper remedy was to declare the statute invalid and enjoin the AOGCC from releasing the data to DNR or to the public.

The state filed a motion for reconsideration which took issue with the superior court's evaluation of the damage to the oil companies and ASRC from disclosure of the KIC well data to DNR and the court's conclusion that DNR served no health and safety functions. Along with the motion, DNR submitted the affidavit of Catherine Ariey, a DNR geologist. The oil companies moved to strike the affidavit on the grounds that it violated Alaska Civil Rule 77(m). The superior court denied both the motion to strike and the motion to reconsider. A permanent injunction order and final judgment were entered on April 27, 1989.

The state has appealed, challenging the superior court's takings analysis and its factual findings concerning the loss of economic value to the oil companies and ASRC from disclosure of the KIC well data to DNR and concerning the scope of DNR's regulatory authority. The oil companies have filed a cross-appeal, alleging that the superior court erred in failing to strike Ariey's affidavit. ASRC joined the oil companies' cross-appeal and has also appealed the superior court's decision that the issue of public disclosure of well data was not ripe for adjudication.

## II. DISCUSSION

### A. Is the Use of the KIC Well Data by DNR without Compensation an Unconstitutional Taking?

Article I, section 18 of the Alaska Constitution provides that "[p]rivate property shall not be taken or damaged for public use without just compensation." The Fifth Amendment to the United States Constitution similarly provides: "nor shall private property be taken for public use, without

just compensation." In deciding this case we follow the approach taken by the United States Supreme Court in *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000, 104 S.Ct. 2862, 2871, 81 L.Ed.2d 815 (1984) (absent explicit confidentiality provision in statute, use by Environmental Protection Agency and disclosure to public of data submitted by pesticide manufacturer to receive registration is not compensable taking). We have previously held that "the term 'damages' affords the property owner broader protection than that conferred by the Fifth Amendment...." *DeLisio v. Alaska Superior Court*, 740 P.2d 437, 439 n. 3 (Alaska 1987). However, the difference between Alaska's takings clause and the federal clause is irrelevant to this case.

We address two issues: (1) Does Alaska law characterize the results of exploratory oil well drillings as property? (2) If so, does DNR's use of the data effect a taking of that property interest? [3]

### 1. Property Interest

■ The companies contend that their oil well data constitute trade secrets protected under both the Alaska and the United States Constitutions. We agree.

"Confidential business information has long been recognized as property." *Carpenter v. United States*, 484 U.S. 19, 26, 108 S.Ct. 316, 320, 98 L.Ed.2d 275 (1987); *see also Monsanto*, 467 U.S. at 1002–04, 104 S.Ct. at 2872–74 (holding that a trade secret is property protected by the Fifth Amendment Taking Clause); *Chamber of Commerce v. Hughey*, 600 F.Supp. 606, 626–27 (D.N.J.1985) ("It is well established in New Jersey law, as in the law of most jurisdictions, that trade secrets are property rights."), *aff'd in relevant part*, 774 F.2d 587, 598 (3rd Cir.1985); *Captain and Co. v. Towne*, 404 N.E.2d 1159, 1162 (Ind.

App.1980); *General Chemical Corp. v. Dep't of Environmental Quality Engineering*, 19 Mass.App. 287, 474 N.E.2d 183, 185–86 (1985) (Hazardous waste facilities, which submit reports to state agency in accordance with agency's hazardous waste regulations, have a property interest in whatever trade secrets may be contained in their reports.); *Mountain States Tel. & Tel. Co. v. Dep't of Public Service Regulation*, 634 P.2d 181, 185–86 (Mont.1981). As the United States Supreme Court stated in *Monsanto*,

> [the] general perception of trade secrets as property is consonant with a notion of "property" that extends beyond land and tangible goods and includes the products of an individual's "labour and invention." 2 W. Blackstone, Commentaries *405; see generally J. Locke, The Second Treatise of Civil Government, ch 5 (J. Gough ed 1947).

467 U.S. at 1002–03, 104 S.Ct. at 2873. By protecting all persons' "enjoyment of the rewards of their own industry," the Alaska Constitution adopts this Blackstone/Locke theory of property. Alaska Const. art. I, § 1.

The Alaska Uniform Trade Secrets Act, which gives statutory protection to trade secrets, defines "trade secrets" as information that

> (A) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

> (B) is the subject of efforts that are reasonable under the circumstances to maintain secrecy.

AS 45.50.940(3).[4] The superior court found that "the KIC well data allow the [compa-

---

**3.** The remaining two questions discussed by the United States Supreme Court in *Monsanto*—whether the taking is for a public use and whether the statute provides adequate compensation—are not at issue in this case.

**4.** The Restatement of Torts provides a similar definition:

> A trade secret may consist of any formula, pattern, device or compilation of information

which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

*Restatement (First) of Torts* § 757 comment b (1939) (This section, together with most discussion of trade practices and labor disputes, is omitted from the Second Restatement because these subjects have become extensively governed by legislation and largely divorced from

nies] to evaluate the potential for oil and gas development of the land surrounding the well and provide [them] with a competitive advantage as to the valuation of these lands." The state does not argue that such finding is clearly erroneous. Since the value of the data depends on its secrecy and the companies obviously have attempted to keep it secret we have no difficulty characterizing the data obtained by the oil companies from the KIC well as trade secrets.[5] We conclude that the information generated by the KIC well is the property of the drillers.[6]

The state, in fact, stipulated during the superior court proceedings that "[p]laintiffs possess property rights in the KIC well data, specifically including the right to exclude the public from the enjoyment of such data by preventing its unauthorized use by the public and prohibiting its disclosure." The state contends on appeal that since statehood, Alaska law has limited the property rights of oil well drillers to exclude the public but not DNR from the well data. We agree with the state's emphasis on the distinction between disclosure to the public and disclosure to DNR. However, we do not adopt the state's approach that the companies never possessed the right to prevent DNR's use of the data. Instead, as discussed below, we conclude that the companies had no "reasonable investment-backed expectation" that DNR would not use the well data for internal departmental purposes.

### 2. Government Action

 The United States Supreme Court has identified three factors that should be taken into account when determining whether government action effects a taking: "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Monsanto*, 467 U.S. at 1005, 104 S.Ct. at 2874 (quoting *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980)). As in *Monsanto*, we conclude that the determinative factor in this case is the drillers' reasonable investment-backed expectations.

Monsanto challenged the use by EPA and the public disclosure of data it submitted to EPA in accordance with the requirements of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). The court distinguished pesticide data submitted during three different time periods, defined by different amendments to the federal pesticide statute. As to amendments effective October 1, 1978, which established the data disclosure mechanisms under attack, the court held that their enactment put Monsanto "on notice of the manner in which EPA was authorized to use and disclose any data turned over to it by an applicant for registration." 467 U.S. at 1006, 104 S.Ct. at 2874. Consequently, with respect to data submitted since October 1, 1978, Monsanto "could not have had a reasonable, investment-backed expectation that EPA would keep the data confidential beyond the limits prescribed in the amended statute itself." *Id.*

On the other hand, during the time that earlier amendments were in effect, between October 22, 1972 and September 30, 1978, the statute "had explicitly guaranteed to Monsanto ... an extensive measure of confidentiality and exclusive use. This explicit governmental guarantee formed the basis of a reasonable investment-backed expectation." *Id.* at 1011, 104 S.Ct.

---

their initial grounding in the principles of tort.). The United States Supreme Court adopted this definition for constitutional purposes in *Monsanto*, 467 U.S. at 1001–02, 104 S.Ct. at 2872.

**5.** This conclusion is consistent with decisions of other jurisdictions which have addressed the issue. *See, e.g., United States v. Geophysical Corp.*, 732 F.2d 693, 701–02 (9th Cir.1984); *Hunter v. Shell Oil Co.*, 198 F.2d 485, 487–89 (5th Cir.1952); *Geophysical Corp. of Alaska v. Andrus*, 453 F.Supp. 361, 370 (D.Alaska 1978);

*Hartman v. State Corp. Comm'n*, 215 Kan. 758, 529 P.2d 134, 146–47 (1974); *Noranda Exploration, Inc. v. Ostrom*, 113 Wis.2d 612, 335 N.W.2d 596, 603 (1983); *see generally* 2 H. Williams and C. Meyers, *Oil and Gas Law* § 442.2 (1990).

**6.** ASRC's entitlement to the data is based on its contract with the oil companies. The companies agreed to provide ASRC any information generated as a result of drilling wells on the KIC property at the expiration of the lease between ASRC and the companies.

at 2877. EPA's disclosure of protected data contrary to that guarantee could, under some circumstances, constitute a taking. *Id.* at 1013, 104 S.Ct. at 2878.

During the period prior to the 1972 amendments, the statute "was silent" on the subject of EPA's use and disclosure of pesticide data. *Id.* at 1008, 104 S.Ct. at 2875. In particular, the statute gave EPA no authority to disclose the data. Moreover, another general statute, the Trade Secrets Act, 18 U.S.C. § 1905, provided for criminal penalties against federal employees who disclose trade secrets in a manner not authorized by law. Notwithstanding these factors, the court held that Monsanto "had no reasonable, investment-backed expectation that its information would remain inviolate in the hands of EPA" in the absence of "an express promise," and the Trade Secrets Act did not constitute such a promise. 467 U.S. at 1008–09, 104 S.Ct. at 2876.

In this case, the trial court did not expressly inquire into the factor of "reasonable investment-backed expectations" in its takings analysis. It did consider this factor, however, when it held that the companies' knowledge of the disclosure requirements of AS 31.05.035(c) before they drilled the KIC well did not "estop" them from challenging the statute. The trial court found that the companies had reasonable expectations that, in reviewing the KIC well data to determine whether to extend confidentiality under AS 31.05.-035(c), DNR would not use the data "for its own internal, proprietary purposes." It based its conclusion on two things: (1) an affidavit by a Chevron exploration manager stating that "Chevron has always" so assumed; and (2) a 1984 opinion letter of an assistant attorney general which approved DNR's review of well data under

AS 31.05.035(c) but which also contained a single sentence stating "that this review ... must be for the only purpose of determining whether confidentiality will be extended beyond the initial period."

Whatever the standard of reasonableness might be for purposes of estoppel, we conclude that the companies'[7] assumption was not a "reasonable investment-backed expectation" for takings purposes.[8] "A 'reasonable investment-backed expectation' must be more than a 'unilateral expectation or an abstract need.' " *Monsanto,* 467 U.S. at 1005, 104 S.Ct. at 2874. Alaska's oil conservation act and regulations contain no "guarantee" or "express promise" that DNR would not, upon review of the KIC well data under AS 31.05.035(c), use the data for internal departmental purposes.

Moreover, the companies were "on notice" that DNR in fact used confidential data filed under AS 31.05.035(c) in its decision making on state oil and gas leasing. *See Hammond v. North Slope Borough,* 645 P.2d 750, 764 (Alaska 1982). This practice was in accordance with a 1978 attorney general's opinion. The opinion advised that the Division of Minerals and Energy Management—which then exercised what the companies term DNR's "proprietary" functions regarding oil and gas—*was* entitled to use "for its own legitimate purposes," while keeping confidential the reports and information filed with the Division of Oil and Gas Conservation (AOGCC's predecessor within DNR).

The companies contend that DNR no longer utilized reports filed under AS 31.-05.035 and 20 AAC 25.070–.071 for leasing purposes after the creation of AOGCC in 1978. We are not persuaded by Chevron's suggestion that the legislature intended to prohibit such use of well data by DNR.

---

**7.** The state correctly notes in its brief that only Chevron and Standard, not ASRC, claim to have had any such expectation, and the only *evidence* submitted by them concerned Chevron, not Standard.

**8.** Defining what constitutes a "reasonable investment-backed expectation" is a question of law and therefore we exercise *de novo* review. *See Langdon v. Champion,* 745 P.2d 1371, 1372 n. 2

(Alaska 1987). We will not reverse the trial court's findings concerning the underlying facts unless "clearly erroneous." *Donnybrook Bldg. Supply v. Interior City,* 798 P.2d 1263, 1266 (Alaska 1990); Alaska R.Civ.P. 52(a). However, we independently review whether the trial court attached the appropriate legal effect to the facts. *See Armco Steel Corp. v. Isaacson Structural Steel Co.,* 611 P.2d 507, 516 n. 22 (Alaska 1980).

Chevron offers nothing in the legislative history of the 1978 amendments to AS 31.05 in support of this position. In fact, in testimony before the Senate Resources Committee on May 22, 1978, O.K. Gilbreth, Jr., Director of DNR's Division of Oil and Gas Conservation, implied that the provision for extended confidentiality was intended to benefit the state as well as the driller who supplied the data. He stated, "[M]y understanding is that if the Commissioner finds that this information, if the well logs and so forth contains significant information, he can in effect put a moratorium on the two years until such time as he decides that it's no longer valuable *to the state* to keep it confidential and then release it after the two years is up." (Emphasis added). Furthermore, the act requiring the reporting of well data expressly provides that such data must be shared with the state "for [its] beneficial use." Ch. 75, § 1, SLA 1960.

The state acknowledges that DNR does not review the reports until a request for extended confidentiality is made. According to DNR, however, once it receives the data it is impractical to ignore the information when making leasing decisions. As the companies themselves have pointed out, "DNR personnel cannot forget what they have seen." DNR has not sought access to the KIC well data during the initial 24–month confidentiality period. In light of AS 31.05.035(c)'s explicit language providing for review by the "commissioner of natural resources," [9] we find the companies' expectation that DNR would not utilize the data following the initial period of confidentiality unreasonable.

We attach little significance to the attorney general's letter of July 3, 1984. First, the focus of the letter was whether DNR could have access to the confidential material filed with AOGCC rather than requiring oil companies to supply separate data when they made a request for extended confidentiality. The attorney general concluded that DNR had a right to direct access to AOGCC's files. The sentence

relied on by the companies is found on the final page of the letter. The language in question says DNR's "review" of well data at AOGCC "must be for the only purpose of determining" whether to extend confidentiality; it does not say that DNR's "use" of the data following that review must be so limited. As discussed above, no party contends that DNR can limit its use of the data once it has access to it. We believe that the attorney general, having approved DNR's access to AOGCC's information, simply intended to insure that DNR did not seek such access until reviewing a request for extended confidentiality as authorized by AS 31.05.035(c).

Second, the companies offer no evidence of their reliance on this letter. The letter was addressed to DNR's Division of Oil and Gas, and nothing in the record establishes that Chevron, Standard, or ASRC knew of it prior to the drilling of the KIC well. In fact, the affidavit of E.K. Espenscied, Chevron's Alaska manager, makes no mention of the letter. He simply attests that "Chevron has always assumed DNR's review of data filed in connection with any request for extended confidentiality is a narrow one and conducted for the exclusive purpose of confirming the data 'contains significant information relating to the valuation of unleased land in the same vicinity' of the well." The issue is not simply whether Chevron expected that DNR would not use the KIC well data for internal purposes, but whether such expectation was reasonable and investment-backed.

No matter how reasonable or unreasonable the companies' expectations may have been, we are not persuaded that they were "investment-backed." The trial court did not consider this issue. Although Chevron says it assumed that DNR would make no use of the KIC well data for purposes other than the AS 31.05.035(c) determination, none of the companies claim that their decision to invest in the KIC well depended in any way on that assumption. Rather, it depended, according to Chevron official Tom Cook, on the assumption that "extend-

---

9. The words "of natural resources" were added by a 1984 amendment. Ch. 6, § 86, SLA 1984.

The amendment clarified rather than changed the existing law. 1984 House Journal 2290.

ed confidentiality" under AS 31.05.035(c)—i.e., confidentiality from the *public* until after the disposal of nearby unleased lands—was "reasonably assured."

This lack of reliance is not surprising, for it is unlikely that a company would have been deterred from leasing or drilling simply because of DNR's confidential use of the well data. The values motivating such investment—the hope of discovering commercial deposits of oil and gas, the utility of the well data to the companies for numerous purposes, and the competitive advantage the data provide vis-a-vis other bidders in future lease sales—outweigh any interest in keeping the data from DNR. We note that DNR's access as lessor to confidential data from wells drilled on *state* oil and gas leases, *see* AS 38.05.180(x), has not kept oil companies from making enormous investments in acquiring and drilling on state leases.

The companies argue that *Monsanto*, 467 U.S. 986, 104 S.Ct. 2862, is inapplicable to this case. According to the companies, EPA's use of the information submitted by Monsanto to acquire pesticide registration is significantly different from DNR's use of the well data at issue here. The companies contend that DNR's "proprietary" use of the KIC well data constitutes a "physical invasion" and therefore the regulatory takings approach of *Monsanto* is inapplicable. The importance the companies attach to the nature of the governmental action at issue is well-founded. "It is well settled that a 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Keystone Bituminous Coal Ass'n v. Debenedictis*, 480 U.S. 470, 488 n. 18, 107 S.Ct. 1232, 1243–44 n. 18, 94 L.Ed.2d 472 (1987) (quoting *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)) (citation omitted).

We disagree, however, with the companies' characterization of DNR's use of the well data. This case does not involve the kind of physical interference [10] with real property at issue in the cases in which the United States Supreme Court has found a per se taking. *See, e.g., Nollan v. California Coastal Comm'n*, 483 U.S. 825, 831–32, 107 S.Ct. 3141, 3145–46, 97 L.Ed.2d 677 (1987) (easement for public access over private beach property); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441, 102 S.Ct. 3164, 3179, 73 L.Ed.2d 868 (1982) (mandated installation of CATV cable and fixtures); *Kaiser Aetna v. United States*, 444 U.S. 164, 180, 100 S.Ct. 383, 393, 62 L.Ed.2d 332 (1979) (imposition of navigable servitude on marina which was unnavigable prior to significant private investment in dredging); *United States v. Causby*, 328 U.S. 256, 264–65, 66 S.Ct. 1062, 1067–68, 90 L.Ed. 1206 (1946) (military appropriation of airspace above private property); *United States v. Lynah*, 188 U.S. 445, 470–71, 23 S.Ct. 349, 357, 47 L.Ed. 539 (1903) (permanent flooding from construction of dam).

The category of per se takings is a narrow one. In *Loretto*, the court articulated the following justifications for the per se category: (1) tradition, 458 U.S. at 430 n. 7, 102 S.Ct. at 3173 n. 7 ("early commentators viewed a physical occupation of real property as the quintessential deprivation of property"); (2) the "serious form of [the] invasion of an owner's property interests," which *inter alia* destroys the owner's "right to possess the occupied space himself," *id.* at 435, 102 S.Ct. at 3176; (3) the avoidance of "otherwise difficult line-drawing problems" involving the size of the area occupied, *id.* at 436–37, 102 S.Ct. at 3176–77; and (4) the minimization of problems of proof, *id.* at 437, 102 S.Ct. at 3177, ("the placement of a fixed structure on land or real property is an obvious fact that will rarely be subject to dispute"). None of these reasons apply here.

**10.** We are unable to comprehend how one can "physically" occupy or invade intangible property. The United States Supreme Court recently rejected a theory similar to that of the companies in this case. *United States v. Sperry Corp.*, 493 U.S. 52, 110 S.Ct. 387, 393, 107 L.Ed.2d 290 (1989) (upheld user fee required to be paid to the United States from amount recovered by American claimants before the Iran–United States Claims Tribunal).

We are also not persuaded by the companies' argument that a permit to drill is significantly different from registration of a pesticide. Like the manufacture of pesticides, drilling for oil and gas is a heavily regulated industry. Both industrial activities are distinguishable from the residential development involved in *Nollan*, 483 U.S. 825, 107 S.Ct. 3141. While the California Coastal Commission simply denies or approves a development permit, AOGCC and DNR continuously monitor drilling operations.

The companies do not dispute AOGCC's authority to require well data and to use the data to prevent waste and protect health and safety. According to the companies, DNR exercises only proprietary functions and therefore its use of the well data is not justified by the police power. We find the line the companies draw between "regulatory" and "proprietary" functions more clear in theory than in practice.

DNR is responsible in large part for implementing the constitutional mandate that the legislature "provide for the utilization, development, and conservation of all natural resources belonging to the State ... for the maximum benefit of its people." Alaska Const. art. VIII, § 2. *See* AS 44.37.-020(a). In the area of oil and gas leasing, the agency's function is not to run an enterprise but to make decisions that "best serve the interests of the state." AS 38.-05.035(e). The legislature has found that "it is in the best interests of the state," for example,

> to encourage an assessment of its oil and gas resources and to allow the maximum flexibility in the methods of issuing leases to
>> (A) recognize the many varied geographical regions of the state and the different costs of exploring for oil and gas in these regions;
>> (B) minimize the adverse impact of exploration, development, production, and transportation activity.

AS 38.05.180(a)(2).

The assessment of the state's oil and gas resources serves at least two legitimate government objectives. First, knowledge of the production potential of state land in various areas is critical to DNR's determination of where development should occur and where preservation is appropriate. Such land management decisions by DNR involve "complex subject matter" and "fundamental policy formulations." *Trustees for Alaska v. State*, 795 P.2d 805, 809 (Alaska 1990). Unlike a private enterprise, DNR is not exclusively driven by the profit motive. The agency must also concern itself with the social, cultural and environmental impacts on the state from oil production. *Id.* at 809–11.

Second, knowledge of the oil and gas production potential of the state's lands promotes the state's economic welfare by maximizing the amount it receives for the lease of its lands. Other jurisdictions have recognized the legitimacy of using the police power to protect the government's financial stability. *See, e.g., Zeigler v. People*, 109 Colo. 252, 124 P.2d 593, 598 (1942) ("The police power relates not merely to the public health and to public physical safety, but also to public financial safety."); *People v. Kohrig*, 113 Ill.2d 384, 101 Ill.Dec. 650, 657–58, 498 N.E.2d 1158, 1165–66 (1986) ("It cannot be seriously questioned that the police power may be used to promote the economic welfare of the State, its communities and its citizens."), *appeal dismissed*, 479 U.S. 1073, 107 S.Ct. 1264, 94 L.Ed.2d 126 (1987); *Sherman–Reynolds, Inc. v. Mahin*, 47 Ill.2d 323, 265 N.E.2d 640, 642 (1970) ("[I]n the interest of general welfare, the police power may be exercised ... to protect the government itself against potential financial loss and the possible disruption of governmental functions."); *Washington Educ. Ass'n v. State*, 97 Wash.2d 899, 652 P.2d 1347, 1351–52 (1982) (state as employer may lay off teachers in response to a financial crisis). In light of the state government's dependence on petroleum-related income, we conclude that DNR's purpose to maximize the income from leasing state land is within the police power.

The cases cited by Chevron, Standard and ASRC do not conflict with this conclu-

sion. None of the cases exclude protection of the government's financial stability from the scope of the police power. Instead, the government action was invalidated in each case because it had no reasonable relationship to any legitimate government purpose. *See, e.g., American Consumer Indus. v. City of New York*, 28 A.D.2d 38, 281 N.Y.S.2d 467, 474 (1967) (franchise for ice monopoly not reasonable exercise of the police power); *Texas Power & Light Co. v. City of Garland*, 431 S.W.2d 511, 518 (Tex. 1968) (purpose of ordinance solely to eliminate competitor of city's electrical service); *City of Tukwila v. City of Seattle*, 68 Wash.2d 611, 414 P.2d 597, 600–01 (1966) (nothing in ordinance justified impairment of franchise to provide electrical service); *Wisconsin Telephone Co. v. City of Milwaukee*, 223 Wis. 251, 270 N.W. 336, 339–40 (1936) (fee exacted for opening pavement to install underground communication lines bore no reasonable relationship to the damage incurred by the city). Contrary to these cases, requiring the disclosure of exploratory well data to DNR clearly aids the agency in determining the optimum balance between development and preservation and in maximizing the revenue from leasing state lands.

Finally, this case is distinguishable from *Noranda*, 335 N.W.2d 596, in which the Wisconsin Supreme Court held that compelled disclosure of well data is a compensable taking. The court held that *public*

disclosure of data filed with the state geologist bore no reasonable relationship to the purpose of informing agency decisions. *Id.* at 604. Such public disclosure is not at issue here.[11] The *Noranda* decision implicitly recognizes the validity of the statutory requirement that oil drillers report well data to the state. *Id.* at 604 n. 8. *See also Hartman*, 529 P.2d at 146 (upheld against takings challenge regulation requiring drillers to file drilling information and samples with geological survey).[12]

B. Did the Superior Court Err in Allowing DNR to Submit New Information in Conjunction with its Motion to Reconsider under Former Civil Rule 77(m)?

In their cross-appeal, the companies contend that former Civil Rule 77(m) does not and ought not authorize the submission of new evidence in conjunction with a motion for reconsideration.[13] The companies appeal the denial of their motion to strike the affidavit of Catherine Ariey which DNR submitted with its motion for reconsideration. They request that this court consider neither the affidavit nor ASRC's 1987 Annual Report, submitted by the state with its opposition to the companies' motion to strike.

We conclude that any error the superior court may have committed in denying the companies' motion to strike is harmless.

11. The superior court held that the companies' challenge to the public disclosure provisions of AS 31.05.035(c) were not ripe for adjudication. We agree with the superior court's analysis.

12. In light of our conclusion that no taking has occurred, we need not address the issue of whether an injunction against disclosure is the appropriate remedy.

13. Former Civil Rule 77(m) provided in part:
(1) A party may move the court to reconsider a ruling previously decided if, in reaching its decision:
(i) The court has overlooked, misapplied, or failed to consider a statute, decision or principle directly controlling; or
(ii) The court has overlooked or misconceived some material fact or proposition of law; or
(iii) The court has overlooked or misconceived a material question in the case; or

(iv) The law applied in the ruling has been subsequently changed by court decision or statute.
(2) The motion for reconsideration shall specifically state which of the grounds for reconsideration specified in the prior subparagraph exists, and shall specifically designate that portion of the ruling, the memorandum, or the record, or that particular authority, which the movant wishes the court to consider. The motion for reconsideration and supporting memorandum shall not exceed five pages.
(3) No response shall be made to a motion for reconsideration unless requested by the court, but a motion for reconsideration will ordinarily not be granted in the absence of such a request.
Alaska R.Civ.P. 77(m) (1990). This rule currently appears as Civil Rule 77(k).

Since the superior court denied the state's motion for reconsideration, the companies received all the relief to which they were entitled. The addition of the Ariey affidavit and ASRC's annual report to the record did not prejudice the companies on appeal. Our decision is based on neither document.

## III. CONCLUSION

For the reasons discussed herein, we conclude that disclosure of well data to DNR following an initial confidentiality period as provided in AS 31.05.035(c) does not constitute an unconstitutional taking. We REVERSE the superior court's decision and VACATE the injunction prohibiting AOGCC from releasing the KIC well data to DNR. DNR shall determine whether an extended period of confidentiality is appropriate. If DNR decides extended confidentiality is unnecessary, the agency shall, in accordance with its stipulation in superior court, provide Chevron, Standard and ASRC "advance notice and an opportunity to challenge any adverse significance determination."