**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellant and Cross–Appellee,**

v.

**Linda WEIFORD, Appellee and Cross–Appellant.**

**Nos. S–4331, S–4332.**

Supreme Court of Alaska.

May 8, 1992.

Rehearing Denied May 20, 1992.

William R. Hickman, Heather Houston, Reed McClure, Seattle, Wash., Clay A. Young, Delaney, Wiles, Hayes, Reitman & Brubaker, Anchorage, for appellant and cross-appellee.

Richard H. Friedman, Jeffrey A. Friedman, Law Offices of Friedman & Rubin, Anchorage, for appellee and cross-appellant.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

### FACTS AND PROCEEDINGS

Linda Weiford was involved in an accident with an uninsured motorist on August 28, 1984. Two days later she contacted her insurer, State Farm Mutual Automobile Insurance Company. State Farm had issued an automobile insurance policy to Weiford when she lived in Oregon which contained uninsured motorist coverage.

As a result of the accident, Weiford experienced pain and numbness in her neck occasionally radiating down her arm. In October 1984 her doctors diagnosed a cervical strain.

The parties began negotiating in an attempt to reach a settlement for Weiford's personal injuries in August 1985. Weiford requested $17,500.[1] State Farm responded with an offer of $3408, then $5000. Weiford reduced her offer to $16,000, then to $14,000, and then to $10,000. When this last offer was not accepted, Weiford withdrew it and requested arbitration. However, when her symptoms reappeared she withdrew her arbitration request until the extent of her injuries could be ascertained.

In July 1986 Weiford's internist diagnosed "left C7 radiculopathy [nerve root injury] ... probably related to underlying cervical disc disease resulting from the automobile accident." His diagnosis was based on the results of Weiford's electromyography. At this point, the parties renewed their negotiations. Weiford demanded her policy limits, $25,000. State Farm agreed to settle for $7500. Weiford counter-offered $18,500. State Farm responded with offers of $10,000, then $12,500. The negotiations were fruitless and arbitration was arranged.

In preparation for the arbitration, State Farm requested an independent medical examination of Weiford. The exam confirmed that Weiford suffered from a nerve root injury. At this point State Farm offered $17,500. This was rejected by Weiford who counter-offered $21,000.

Prior to the November 5, 1987 arbitration, State Farm made its final offer of

---

1. According to State Farm, the uninsured motorist coverage in Weiford's Oregon policy was $15,000. However, State Farm treated her as an Alaskan policy holder with $25,000 worth of coverage.

$20,000. This was rejected and the arbitration panel set Weiford's damages at $22,000. This amount was paid by State Farm. Weiford indicates that she spent some $5500 in attorney's fees in order to obtain the arbitration award.

In April 1988 Weiford sued State Farm for punitive and compensatory damages for its alleged bad faith in handling her claim. At the conclusion of the trial, the jury found that State Farm had breached its duty of good faith. It awarded Weiford $18,007.50 in compensatory damages and $1,200,000 in punitive damages. After the court denied State Farm's post-judgment motions, State Farm appealed the verdict to this court.

## DISCUSSION

The main issues in this case are whether there was sufficient evidence to warrant submission to the jury of Weiford's bad faith and punitive damages claims. For the reasons that follow we conclude that there was sufficient evidence to raise a jury question as to bad faith, but not as to punitive damages.

Punitive damages have a two-fold purpose: "to punish the wrongdoer and to deter the wrongdoer and others like him from repeating the offensive act." *Providence Washington Ins. Co. of Alaska v. City of Valdez*, 684 P.2d 861, 863 (Alaska 1984). Since these objectives go beyond the primary purpose of tort law, to provide just compensation for the wrong done, "punitive damages are not favored in law. They are to be allowed only with caution and within narrow limits." *Alaska Placer Co. v. Lee*, 553 P.2d 54, 61 (Alaska 1976). Consistent with this approach, we have limited punitive damages to cases where the wrongdoer's conduct could fairly be categorized as "outrageous, such as acts done with malice or bad motives or reckless in-

difference to the interests of another." *State Farm Fire & Casualty Co. v. Nicholson*, 777 P.2d 1152, 1158 (Alaska 1989); *Alyeska Pipeline Serv. Co. v. Beadles*, 731 P.2d 572, 574 (Alaska 1987); *Ross Lab., Div. of Abbott Lab. v. Thies*, 725 P.2d 1076, 1081 (Alaska 1986). Malice may be inferred if the acts exhibit "a callous disregard for the rights of others." *Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 774 (Alaska 1982). However, "where there is no evidence that gives rise to an inference of actual malice or conduct sufficiently outrageous to be deemed equivalent to actual malice," the trial court need not, and indeed should not, submit the issue of punitive damages to the jury. *Id.; Beadles*, 731 P.2d at 574.[2]

Despite the narrow range in which punitive damages may be awarded, the role of the appellate court in reviewing punitive damages awards is limited. We will reverse a punitive damages award "only if we have a firm conviction based on the record as a whole that the trial court erred and we must intervene to prevent a miscarriage of justice." *Alaska Village, Inc. v. Smalley*, 720 P.2d 945, 948 (Alaska 1986).

■ Weiford's claim of bad faith is based on the covenant of good faith and fair dealing which is implied in all contracts. *Alaska Pacific Assur. Co. v. Collins*, 794 P.2d 936, 947 (Alaska 1990). Generally, claims that the implied covenant has been breached may be brought only in contract. *ARCO Alaska v. Akers*, 753 P.2d 1150, 1153–54 (Alaska 1988). However, bad faith claims brought by insured persons against their insurance companies may be brought in tort as well as in contract. *State Farm Fire & Casualty Co. v. Nicholson*, 777 P.2d at 1157.

Not all conduct which amounts to the tort of bad faith is sufficiently outrageous to warrant an award of punitive damages.

---

2. The legislature has also recognized the narrow limits in which punitive damages should be allowed. AS 09.17.020 provides that punitive damages may not be awarded "unless supported by clear and convincing evidence." This act applies to all causes of action accruing after July 11, 1986. This effective date might have potentially caused a problem in this case, as

some of State Farm's conduct which Weiford alleged to be outrageous took place before and some took place after this effective date. This potential difficulty was, however, resolved when Weiford submitted an instruction which was given by the court which required Weiford "to prove the outrageousness of defendant's conduct by clear and convincing evidence."

That was the case in *Nicholson* where the insured made a claim under his homeowner's policy for damages caused when a water main broke. Although State Farm agreed to cover a related claim asserted by a neighbor, it denied coverage of the insured's claim. *Id.* at 1153–54. Three months later State Farm agreed that there was coverage, but waited another year and a half before making a formal offer of settlement. The insured's expert witness testified that State Farm's delay was both unreasonable and outrageous. *Id.* at 1154. We concluded based on our review of the entire record that "there was insufficient evidence as a matter of law to support a finding of outrageous conduct or a gross deviation from an acceptable standard of reasonable conduct in order to sustain an award of punitive damages." *Id.* at 1158. However, the jury's award of compensatory damages based on State Farm's breach of the implied covenant of good faith and fair dealing was affirmed.

Weiford's primary argument in support of her punitive damages award is centered on the fact that in 1984 and 1985 State Farm decided to take a "tough stance" on payments to insureds. This policy was implemented in part by periodic evaluations of State Farm's adjusters and supervisors in which paid claims' averages were monitored. Weiford contends that this policy prompted State Farm to adopt an uncompromising attitude toward settlement of her case. She argues that this was manifested by the early $5000 offer which her expert witness characterized as totally inadequate. Weiford also contends that the $7500 offered by State Farm in July 1986 was "unreasonably low." Further, pointing to the fact that between July 1986 and November 1987 State Farm raised its settlement offers from $7500 to $10,000, $12,500, $17,500, and finally $20,000, Weiford argues that State Farm knew that its offers below $20,000 were not reasonable.

Weiford also contends that a punitive damages award could be based on a State Farm's supervisor's note in the claim file not to offer more money than $20,000 because "with policy limits of $25 K, insured has more to lose by going to arbitration than we do." Further, Weiford contends that State Farm was in violation of its duty of good faith and fair dealing because it took positions in arbitration which allegedly were knowingly false.

■ In our view, while there is some evidence which would justify a finding that State Farm was acting in bad faith, none of the evidence shows conduct which may fairly be categorized as outrageous.

The crux of Weiford's bad faith case was the testimony of her expert, George Broatch. Broatch testified that no single act of State Farm amounted to bad faith, but that cumulatively State Farm's actions did:

> It—to me it was a matter of the company philosophy. I don't really have any quarrel with the day to day handling of the file particularly. I think that perhaps they could have done it a little differently, but I know, for example, Polly [Marsh—the State Farm adjuster assigned to the case] asked for $7,500.00 authority at one time when I thought the case should have been settled, and so I really don't have any quarrel with this day's handling or that day's handling or whatever, but they—these people were obviously faced with some severe parameters that they had to follow and it meant that they had to chop claims up, tell people they just weren't gonna get what they were entitled to.

State Farm's offer of $5000 made in August 1985 was made when the diagnosis of Weiford's injury was that of a cervical strain which her physician had advised her was of a "likely benign self-limited nature." Her physician had placed no limitation on her activities at that point and advised her to continue swimming, running and playing racquetball. Marsh, the adjuster on Weiford's case, had requested authority of $7500 to settle Weiford's case on August 26, 1985. Karl Hahn, Marsh's supervisor, testified that he thought $7500 was too high. Accordingly, he reduced the authority to $5000, which he felt was adequate. Marsh had earlier evaluated the case as worth $3000 on November 28, 1984.

Broatch evaluated the reasonable range for a settlement at between $10,000 and $15,000. However, he incorrectly indicated that Weiford's nerve root problems had been confirmed by studies as of August 1985.[3] In fact, such studies were not conducted until the spring of 1986.

It appears that in mid-July 1986 medical reports were forwarded to State Farm by Weiford's attorney indicating that an electromyography had revealed positive signs of nerve root damage. When this report was received, Hahn authorized Marsh to increase the offer of settlement to $7500. Hahn also directed that the case be referred to attorney Huddleston. Huddleston reviewed the case and opined that the minimum value was $12,500. State Farm authorized settlement in this amount, but directed Huddleston to first make a $10,000 offer. When this was rejected it was followed by a $12,500 offer. State Farm then sought a medical evaluation from Dr. Newman, a physician retained by State Farm. This was performed in March 1987. Dr. Newman verified that Weiford had a nerve root injury: "The patient clearly has a C7 radiculopathy." Following receipt of Dr. Newman's report, Marsh requested authority to settle for $17,500. This authority was granted and an offer at that level was made. Some four months later with arbitration pending, State Farm raised its settlement offer to $20,000, which was its final offer. As noted, the arbitrators awarded $22,000 in November 1987.

We find nothing in this sequence of events which can be characterized as outrageous. Given Broatch's testimony, the $5000 offer might support a fact finder's conclusion that State Farm was guilty of bad faith. However, because of Weiford's high level of physical activity, the absence of definitive medical test results in 1985,[4] and the fact that Weiford's physicians evidently believed that her injury would be self resolving, even this conclusion is fairly debatable. The evidence will not reasonably support the further conclusion that this offer was so low as to be outrageous.

The course of the offers following receipt of Weiford's physician's report, which for the first time detected a nerve root injury, is difficult to characterize even as being in bad faith. When the report was received the offer was increased to $7500 and then quickly to $10,000 and $12,500, within the range which Broatch testified as reasonable. Following verification by State Farm's physician of Weiford's nerve root damage, State Farm again raised its offer, first to $17,500 and then to $20,000. As measured by the arbitrator's award and Broatch's testimony, both of the latter offers were clearly within a reasonable range.

The supervisor's note to the effect that the insured had more to lose than State Farm by going to arbitration was written in the context of evaluating whether to offer more than $20,000. As noted, the $20,000 offer clearly was reasonable. While the file note might be reflective of a bad motive, since the offer in question was reasonable, the note cannot independently form the basis for a punitive damages award.

State Farm attorney Huddleston's advocacy during the arbitration of the claim was vigorous, but there was evidentiary support for each of the positions which he took.[5] Thus, Huddleston's advocacy was not outrageous or malicious.

---

**3.** On direct examination, Broatch testified as follows:

Q: [W]hat was your understanding of what the medical reports were saying at this point in time [August 1985 when State Farm offered $5,000]?

A: Well, it was a typical neck sprain case and a bothersome one because the doctors all indicated that they—the studies they'd done indicated that she did have what's called nerve root problems and that they didn't see that the—that there was any end to it. Although it had—as I say, it had stabilized somewhat.

**4.** As discussed earlier, Broatch appears to have misunderstood when the nerve root injury was detected.

**5.** Huddleston's alleged bad faith acts included: 1) arguing that Weiford's medical problems were caused by "work stress" when Weiford's and State Farm's doctors believed that her medical problems were related to the accident; 2) arguing that Weiford had purposely escalated her medical expenses when State Farm employees agreed that Weiford was not faking or exaggerating her symptoms and that her medical

For the above reasons we conclude that the evidence does not reasonably support a conclusion that State Farm was guilty of a gross breach of accepted standards of conduct which might be characterized as outrageous or malicious. We are firmly convinced "based on the record as a whole that the trial court erred and we must intervene to prevent a miscarriage of justice." *Alaska Village, Inc. v. Smalley*, 720 P.2d at 948. Thus, the award of punitive damages must be vacated. We conclude however that there was sufficient evidence to support a jury finding that State Farm acted in bad faith.

■ State Farm also contends that the court erred in giving an instruction on the Unfair Claim Settlement Practices Act, AS 21.36.125. The instruction the court gave stated that if State Farm failed to attempt in good faith to make prompt and equitable settlement of claims, or compelled insureds to litigate by offering substantially less than the amounts ultimately recovered "with such frequency as to indicate a practice," such acts might be considered in deciding whether or not State Farm breached its duty of good faith and fair dealing in this case.[6]

We held in *O.K. Lumber Co. v. Providence Washington Ins. Co.*, 759 P.2d 523, 527 (Alaska 1988), that the Unfair Claim Settlement Practices Act does not create a private right of action for damages. That question was of importance in *O.K. Lumber* because that case was brought by a third-party claimant having no contractual

relationship with the insurance company. Without such a relationship, the claimant was not able to sue for breach of the covenant of good faith and fair dealing. *Id.* at 526. Thus the claimant was forced to rely on the Act if he was to have a cause of action for bad faith against the insurance company.

That is not the situation in the present case. Weiford's claim against State Farm is a first-party claim, since she is an insured of State Farm. The covenant of good faith and fair dealing thus runs to her from State Farm and is enforceable both in contract and in tort. *Nicholson*, 777 P.2d at 1156–57. The instruction given by the court merely informed the jury as to two types of conduct which could be considered evidence of bad faith: frequently failing to make prompt and equitable settlements in cases where liability is reasonably clear and frequently compelling insureds to litigate by offering substantially less than the amounts ultimately recovered. State Farm does not dispute that it is required to make prompt and equitable offers of settlement to its policyholders and to otherwise treat them fairly. The testimony of Karl Hahn acknowledges these duties. The fact that the instruction is based on a statute added nothing to the case, and the instruction was therefore not prejudicial to State Farm.[7]

■ State Farm also argues that Weiford's closing argument was improper in certain respects. However, counsel did not object to the argument. In the absence of

---

expenses were proper; 3) arguing that Weiford refused to see an orthopedic physician and refused to return to see the physician retained by State Farm, Dr. Newman, in the face of testimony by State Farm employees that Weiford was always cooperative and in the absence of evidence that she ever refused to see Dr. Newman; and 4) arguing in arbitration that the medical witnesses had said that there were minimal or nonexistent findings when State Farm knew that Weiford's doctors and its own doctor had concluded that there was objective evidence of nerve root damage.

6. Instruction No. 18 stated:
 AS 21.36.125 provides that an insurance company may not commit or engage in with such frequency as to indicate a practice any of the following acts or practices:

(1) Fail to attempt in good faith to make prompt and equitable settlement of claims in which liability is reasonably clear; or
 (2) Compel insureds to litigate for recovery of amounts due under insurance policies by offering substantially less than the amounts ultimately recovered in actions brought by those insureds.
 If you find that State Farm violated this law, you may consider this in deciding whether or not State Farm breached its duty of good faith and fair dealing in this case.

7. *See* Alaska Evidence Rule 406: "Evidence of ... routine practice of an organization ... is relevant to prove that the conduct of ... the organization on a particular occasion was in conformity with ... the routine practice."

such an objection, State Farm waived its right to appeal this point unless there is a demonstration that plain error was committed. *Teamsters Local 959 v. Wells,* 749 P.2d 349, 362 n. 27 (Alaska 1988); *In re L.A.M.,* 727 P.2d 1057, 1059 (Alaska 1986) ("plain error exists where an obvious mistake has been made which creates a high likelihood that injustice has resulted"). We have reviewed the various alleged improprieties in Weiford's counsel's argument and find that none of them rise to the level of plain error.

For the above reasons, the award of punitive damages is REVERSED. The award of compensatory damages is AFFIRMED. The case is REMANDED for recalculation of attorney's fees under Civil Rule 82.

BURKE, J., dissents in part.

MOORE, J., not participating.

BURKE, Justice, dissenting in part.

I would affirm the jury's award of punitive damages. Viewed in the light most favorable to Weiford, I think the evidence supports the award, and the record certainly does not persuade me that "we must intervene to prevent a miscarriage of justice." *Alaska Village, Inc. v. Smalley,* 720 P.2d 945, 948 (Alaska 1986).

Otherwise, I concur in the opinion of the court.