Susan D. ANDERSON, Appellant/Cross–Appellee,

v.

STATE of Alaska ex rel. CENTRAL BERING SEA FISHERMEN'S ASSOCIATION and Carl Merculief, Appellee/Cross–Appellant.

Nos. S–10416, S–10425.

Supreme Court of Alaska.

Oct. 16, 2003.

19. *Id.* at 392.

20. *Id.* at 392 n. 13; AS 47.10.086(c)(1).

David Karl Gross, Timothy J. Petumenos, Birch, Horton, Bittner & Cherot, Anchorage, for Appellant/Cross–Appellee.

Gary M. Guarino, Assistant Attorney General, Anchorage, Bruce M. Botelho, Attorney General, Juneau, for Appellee/Cross–Appellant.

Before: MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## *OPINION*

PER CURIAM.

## I. FACTS AND PROCEEDINGS

A jury awarded Susan Anderson compensatory and punitive damages against Central Bering Sea Fishermen's Association and its president, Carl Merculief, based on claims of wrongful discharge and defamation. In an earlier appeal we held that part of the compensatory award was excessive, but we upheld punitive damages awards of $400,000 against the association and $200,000 against Merculief.[1] The present appeal concerns the state's claim to half of the punitive damages under AS 09.17.020(j).[2]

After the court entered judgment in her favor, Anderson filed a motion asking the court to declare AS 09.17.020(j) unconstitutional. She argued that the statute violated the due process, takings, and equal protection clauses of the United States and the Alaska Constitutions. The state intervened, made a motion asserting its statutory right to fifty percent of punitive damages, and opposed Anderson's motion. The superior court denied Anderson's motion and granted the state's, finding AS 09.17.020(j) to be constitutional.

In upholding the statute, the superior court issued an opinion holding that Anderson had no constitutionally protected "property interest" in the whole award of punitive damages and that the allocation of punitive damages to the state thus did not constitute a taking or violate Anderson's rights to due process. The court also rejected Anderson's equal protection claim, finding that the statute affected only economic inter-

---

1. *Central Bering Sea Fishermen's Ass'n v. Anderson,* 54 P.3d 271 (Alaska 2002).

2. AS 09.17.020(j) provides:
 If a person receives an award of punitive damages, the court shall require that 50 per-

cent of the award be deposited into the general fund of the state. This subsection does not grant the state the right to file or join a civil action to recover punitive damages.

ests and bore a fair and substantial relationship to legitimate government objectives.

The court ordered Anderson to submit an amended final judgment that granted the state fifty percent of punitive damages. At this point a dispute arose as to the interpretation of AS 09.60.080. That section provides that contingent attorney's fees shall be "calculated" before the state's portion of punitive damages has been deducted from the total award of damages.[3] The state contended that this section only governs the calculation of the plaintiff's attorney's fee and that it was entitled to fifty percent of the punitive damages award before fees are deducted. The superior court rejected this argument.

The state filed a motion for reconsideration, contending that at least it should be allowed to share in attorney's fees that had been awarded to Anderson under Civil Rule 68. The superior court summarily denied the state's motion for reconsideration, effectively ruling that the state was not entitled to any of the fees awarded to Anderson.

## II. STANDARD OF REVIEW

■ The constitutionality of AS 09.17.020(j) and the proper interpretation of AS 09.60.080 are issues of law.[4] We review these issues de novo,[5] adopting the rule of law that is most persuasive in light of precedent, policy, and reason.[6]

## III. ISSUES AND DECISION

There are three issues presented in this case:

1. Is AS 09.17.020(j), which allocates half of punitive damage awards to the state, constitutional as applied in this case?

2. Under AS 09.60.080 should a portion of contingent attorney's fees incurred by a plaintiff in obtaining a punitive damage award be deducted pro rata from the state's portion of the award?

3. Where the plaintiff has received enhanced attorney's fees under Alaska Civil Rule 68, should these fees be taken into account in calculating the amount of fees to be deducted pro rata from the state's portion of the punitive damage award?

The trial court gave affirmative answers to the first two issues and a negative answer to the third. This court is evenly divided on the first and third issues. As to the first issue, Justices Matthews and Eastaugh favor affirmance and Justices Bryner and Carpeneti favor reversal. As to the third issue, Justices Bryner and Carpeneti favor affirmance and Justices Matthews and Eastaugh favor reversal. As to the second issue, the court is unanimous and agrees with the trial court's resolution.

Our case law establishes that a decision by an evenly divided court results in an affirmance.[7] An affirmance by an evenly divided court is not binding precedent.[8] The opinion of the justices agreeing with the decision of the superior court is referred to as the dispositional opinion.[9] Since at least two mem-

---

3. AS 09.60.080 provides:
 > If an attorney contracts for or collects a contingency fee in connection with an action for personal injury, death, or property damage and the damages awarded by a court or jury include an award of punitive damages, the contingent fee due the attorney shall be calculated before that portion of punitive damages due the state under AS 09.17.020(j) has been deducted from the total award of damages.

4. Anderson argues that the question of awarding attorney's fees—and the impact of that award on the state's allocation of punitive damages—is an "[issue] related to the award of attorney's fees," subject to the abuse of discretion standard. As the state points out, however, "[t]he superior court's rulings [with respect to AS 09.60.080] did not involve a determination of the 'prevailing party' or the proper amount of attorney's fees under Alaska Civil Rule 82." Instead, the court was asked to determine the meaning of AS 09.60.080. Thus, we use a de novo, and not an abuse of discretion, standard.

5. *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 603 (Alaska 1999); *Sauve v. Winfree*, 907 P.2d 7, 9 (Alaska 1995).

6. *Jaso v. McCarthy*, 923 P.2d 795, 801 (Alaska 1996); *K & L Distrib., Inc. v. Kelly Elec., Inc.*, 908 P.2d 429, 431 (Alaska 1995).

7. *Reeves v. Alyeska Pipeline Serv. Co.*, 56 P.3d 660 n. 1 (Alaska 2002).

8. *Id.*

9. *John's Heating Serv. v. Lamb*, 46 P.3d 1024, 1041 (Alaska 2002).

bers of the court agree with the superior court's decision as to each of the three issues, the superior court's decision will be affirmed.

Part I of Justice Matthews's separate opinion, joined in by Justice Eastaugh, is the dispositive opinion as to the first issue; Part II is the opinion of the court as to the second issue; Part III is a dissenting opinion as to the third issue. Part I of Justice Bryner's opinion, joined in by Justice Carpeneti, is a dissenting opinion as to the first issue; Part II is the dispositive opinion as to the third issue.

The judgment of the superior court is AFFIRMED.

FABE, Chief Justice, not participating.

MATTHEWS, Justice, with whom EASTAUGH, Justice, joins, concurring and dissenting.

## I.

### Constitutional Issues

█ Subsequent to the superior court's decision, this court ruled on the constitutionality of AS 09.17.020(j). In *Evans ex rel Kutch v. State*, in an evenly divided opinion, we affirmed a superior court decision that declared the 1997 tort reform legislation to be facially constitutional.[10] Subsection .020(j) was challenged in *Evans* as violating substantive due process, the takings clause, and the right to trial by jury.[11] The dispositional opinion written by Chief Justice Fabe and joined by Justice Eastaugh concluded that these challenges lacked merit.[12] Justice Bryner, in a dissenting opinion joined by Justice Carpeneti, concluded that subsection .020(j) violated substantive due process and amounted to an unconstitutional taking under the Alaska Constitution.[13]

In the present case Anderson argues that the statute as applied to her violates substantive due process and the takings and equal protection clauses of the Alaska[14] and United States[15] Constitutions. I conclude that her arguments lack merit. As to the takings and substantive due process challenges, I agree with the dispositive opinion in *Evans* and with additional reasons presented by the state and discussed in this opinion. With respect to equal protection I conclude that the statute does not unconstitutionally discriminate.

### A. Takings

The Fifth Amendment of the United States Constitution provides that private property shall not be taken for public use without just compensation. Similarly, article I, section 18 of the Alaska Constitution provides that "private property shall not be taken or damaged for public use without just compensation." Noting that the takings clause has been liberally construed in favor of the property owner in Alaska,[16] Anderson argues that allocating fifty percent of her punitive damages award to the state constitutes an unconstitutional taking of her property. The state responds that Anderson has no vested property right in a full punitive damages award.

The state is correct. We have recognized that unlitigated claims are property interests that "cannot be taken away from the plaintiff by government action without due process of law."[17] However, as the state points out, unlitigated claims only become property when they accrue, and a claim cannot accrue before the events that give rise to it occur. Here, Anderson's claim accrued in 1998, after August 7, 1997, the effective date of AS 09.17.020(j).[18]

---

**10.** 56 P.3d 1046 (Alaska 2002).

**11.** *Id.* at 1057.

**12.** *Id.* at 1057–59.

**13.** *Id.* at 1075–79 (Bryner, J., dissenting).

**14.** Alaska Const. art. I, §§ 1, 7, 18.

**15.** U.S. Const. amend. V, XIV, § 1.

**16.** Anderson cites *Ehrlander v. State, Dep't of Transp. & Pub. Facilities*, 797 P.2d 629, 633 (Alaska 1990), for this proposition.

**17.** *Patrick v. Lynden Transport, Inc.*, 765 P.2d 1375, 1378 (Alaska 1988).

**18.** *See Norcon, Inc. v. Kotowski*, 971 P.2d 158, 175 n. 21 (Alaska 1999) (AS 09.17.020 does not apply to any cases before August 7, 1997, because of express legislative intent, but applies to all cases after that date).

■ Before a claim accrues, the law defining it may be changed without violating the constitution. As the United States Supreme Court has noted:

> Our cases have clearly established that "[a] person has no property, no vested interest, in any rule of the common law." The "Constitution does not forbid the creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object," despite the fact that "otherwise settled expectations" may be upset thereby.[19]

The conclusion that an unaccrued claim is not property follows from the recognition that *property itself* is a concept that arises from and is dependent upon state law at the time of its creation.

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.[20]

In *Ruckelshaus v. Monsanto Co.* the United States Supreme Court noted similarly that it was a "basic axiom that '[p]roperty interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " [21] The *Ruckelshaus* Court recognized that "property" extends beyond land and tangible goods to intangible interests such as liens created under state law or valid contracts or trade secrets.[22] Critical to whether these intangible rights are constitutionally protected from a government taking is the nature of the "reasonable investment-backed expectations" of the party seeking protection.[23]

We have also recognized the importance of reasonable expectations in constitutional takings claims. Thus in *State, Department of Natural Resources v. Arctic Slope Regional Corp.* we held that data generated by an oil company drilling on private land were not constitutionally protected from use by the state Department of Natural Resources.[24] Critical to this issue was an examination of the nature of the oil company's "reasonable investment-backed expectations." [25] And in *Beluga Mining Co. v. State, Department of Natural Resources* we held that Beluga had no "reasonable investment-backed expectations" because it "developed its claims despite the pending ... litigation ... and despite [a statute] which made Beluga's rights subject to existing claims." [26]

Anderson's reasonable expectations are controlled by the law in effect when her claim accrued. Since subsection .020(j) was effective as of the accrual of her claim, she could have no reasonable expectation to a punitive damages award that she would not have to share with the state, as provided in the statute.

In conclusion, because whether a claim is "property" is defined by the laws in existence when the claim arose, it follows that Anderson's claim for punitive damages can be protected property only insofar as permitted by AS 09.17.020(j). Similarly, since reasonable expectations are critical both in determining whether a claim is property and whether government interference with it is a taking, no more than fifty percent of the award is Anderson's property and the allocation of the other fifty percent to the state is not an unconstitutional taking. I therefore conclude that AS 09.17.020(j) as applied to Anderson does not violate the takings clauses of the Alaska Constitution or the federal constitution.

**19.** *Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 88 n. 32, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (citations omitted).

**20.** *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

**21.** 467 U.S. 986, 1001, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

**22.** *Id.* at 1003–04, 104 S.Ct. 2862.

**23.** *Id.* at 1006–07, 104 S.Ct. 2862.

**24.** 834 P.2d 134 (Alaska 1991).

**25.** *Id.* at 139.

**26.** 973 P.2d 570, 576 (Alaska 1999).

This conclusion is consistent with the decisions of most other state supreme courts that have been presented with takings challenges to statutes allocating some part of punitive damages awards to governmental entities.[27] Only Colorado, in *Kirk v. Denver Publishing Co.*,[28] has reached a contrary result. The dispositional opinion in *Evans* noted that *Kirk* is distinguishable from the present case on narrow statutory grounds.[29] I also believe that *Kirk* is implicitly based on a rationale inconsistent with that which is expressed in this opinion and thus disagree with it.[30]

## B. Substantive Due Process

 Anderson argues that subsection .020(j) violates her substantive due process rights because it is not rationally related to the achievement of a legitimate purpose. Substantive due process serves as a guarantee that legislation must be at least minimally rational:

> The constitutional guarantee of substantive due process assures that a legislative body's decision is not arbitrary but instead based on some rational policy. If any conceivable legitimate public policy for the enactment is either apparent or offered by those defending the enactment, the party challenging it must disprove the factual basis for the justification.[31]

The 1997 tort reform legislation had several expressed purposes, including to:

> (1) encourage the efficiency of the civil justice system by discouraging frivolous litigation and by decreasing the amount,

cost, and complexity of litigation without diminishing the protection of innocent Alaskans' rights to reasonable, but not excessive, compensation for tortious injuries caused by others;

> (2) provide for reasonable, but not excessive, punitive damage awards against tortfeasors sufficient to deter conduct and practices that harm innocent Alaskans while not hampering a positive business environment by allowing excessive penalties;

> (3) encourage individual savings and economic growth by fostering an environment likely to control the increase of liability insurance rates to individuals and businesses resulting in a savings to the state, municipalities, and private businesses that are self-insured;

> . . . .

> (5) alleviate the high cost of malpractice insurance premiums that discourage physicians, architects, engineers, attorneys, and other professionals from rendering needed services to the public;

> . . . .

> (10) reduce the amount of litigation proceeding to trial by modifying the allocation of attorney fees and court costs based on the offer of judgment and the final court award, thereby providing a financial incentive to both parties to settle the dispute[.][32]

Anderson contends that although the dual purposes of reducing litigation expenses and insurance rates are legitimate, AS

---

**27.** *See Gordon v. State,* 608 So.2d 800, 801–02 (Fla.1992); *Mack Trucks, Inc. v. Conkle, et al.,* 263 Ga. 539, 436 S.E.2d 635, 639 (1993); *Shepherd Components, Inc. v. Brice Petrides–Donohue & Assoc.,* Inc., 473 N.W.2d 612, 619 (Iowa 1991); *Fust v. Attorney General,* 947 S.W.2d 424, 431 (Mo.1997); *DeMendoza v. Huffman,* 334 Or. 425, 51 P.3d 1232, 1234 (2002).

**28.** 818 P.2d 262, 267–70 (Colo.1991).

**29.** *Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1058, n. 74 (Alaska 2002).

**30.** I am not alone in this belief. The Oregon Supreme Court recently stated in *DeMendoza:*

> Like the Supreme Court of Missouri, we do not agree with "the implicit conclusion in *Kirk*

that a plaintiff has a greater property interest in a judgment upon a tort claim than the interest recognized by law when the claim accrued." *Fust v. Attorney General,* 947 S.W.2d 424, 431 (Mo.1997). *See also Gordon v. State,* 585 So.2d 1033, 1036 (Fla.App.1991) ("where an existing statute provides that funds recovered under it are subject to a prior claim, a party cannot thereafter obtain a vested right to that claim").

51 P.3d at 1247 n.17.

**31.** *Gonzales v. Safeway Stores, Inc.,* 882 P.2d 389, 397–98 (Alaska 1994) (quoting *Keyes v. Humana Hosp. Alaska, Inc.,* 750 P.2d 343, 351–52 (Alaska 1988)) (internal citations omitted).

**32.** Ch. 26, § 1, SLA 1997.

09.17.020(j) does not advance them. But she does little to develop her argument. She simply states a general belief that sharing punitive damages awards with the state has no impact because it does not reduce awards. She also refers to studies estimating that punitive damages make up only three to six percent of all civil awards.

But these assertions are too narrow. As the state points out, allocating half of all punitive damage awards to the state will reduce the incentive for plaintiffs to pursue punitive damages claims. The statute will also encourage plaintiffs to settle their cases since the state only shares in punitive damages when an award is made.[33] These incentives could reduce both the overall number of punitive damage claims as well as the number of punitive damage claims that actually go to trial. This effect could reasonably be expected to have a moderating influence on liability insurance premiums. Further, the incentive to settle punitive damage claims could reduce the length and complexity of litigation, thereby reducing the overall cost of litigation. The state's expectation that AS 09.17.020(j) will help to fulfill these purposes is at least minimally rational.

Another justification for subsection .020(j) also passes minimum rationality review. The subsection is meant, in part, to increase state revenues, similar to the impact of law requiring criminal and civil fines to be paid to the state.

■ The primary purpose of tort law is to provide just compensation to the tort victim.[34] Compensatory damage awards are designed to achieve this purpose. Punitive damages have different objectives. They are intended "to punish the wrongdoer and to deter the wrongdoer and others like him from repeating the offensive act."[35] As such, they are like fines imposed in criminal and civil cases. Fines, of course, are paid into the state general fund. A number of judges and commentators have suggested over the years that punitive damages should be paid to a public entity because they have the same purposes as criminal fines, these purposes are inherently public in nature, and the individual plaintiff has by definition already been made whole by compensatory damages.[36]

33. Anderson acknowledges that the incentive to settle inherent in the statute is likely to be effective: "This potential for settlement is likely to happen a lot, considering that both a plaintiff and defendant would benefit significantly by cutting the state out of the case."

34. *State Farm Mut. Auto. Ins. Co. v. Weiford*, 831 P.2d 1264, 1266 (Alaska 1992).

35. *Id.* (quoting *Providence Washington Ins. Co. of Alaska v. City of Valdez*, 684 P.2d 861, 863 (Alaska 1984)).

36. As far back as 1877, one judge commented:
It is difficult on principle to understand why, when the sufferer by a tort has been fully compensated for his suffering, he should recover anything more. And it is equally difficult to understand why, if the tortfeasor is to be punished by exemplary damages, they should go to the compensated sufferer, and not to the public in whose behalf he is punished.
*Bass v. Chicago & N.W. Ry. Co.*, 42 Wis. 654 (Wis.1877) (Ryan, C.J., concurring); *see also Spokane Truck & Dray Co. v. Hoefer*, 2 Wash. 45, 25 P. 1072, 1074 (1891) (condemning punitive damages for "appropriat[ing] money which is supposed to be paid for the benefit of the state").
Similar positions have also been expressed more recently. For example, in a 1983 dissent then-Justice Rehnquist commented "[e]ven as-

suming that a punitive 'fine' should be imposed after a civil trial, the penalty should go to the state, not to the plaintiff—who by hypothesis is fully compensated." *Smith v. Wade*, 461 U.S. 30, 59, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (Rehnquist, J., dissenting).
Professor Calvin R. Massey has likewise written:
Since the purpose of punitive damages is to punish the defendant for his acts, and not to redress some injury done to the plaintiff, it is anomalous to permit private recovery of the punishment. The theoretical justification for the punishment suggests that punitive damages ought to be paid to the state and not a private party.
Calvin R. Massey, *The Excessive Fines Clause and Punitive Damages: Some Lessons from History*, 40 Vand. L.Rev. 1233, 1270 (1987).
A Harvard Law Review note in 1992 suggested a solution for obtaining the
optimal level of liability on the defendant consistent with the goals of deterrence or retribution while providing the plaintiff with no more than full compensation.... The difference between the defendant's total liability and the plaintiff's award would go to a general fund used to reduce taxes.
Note, *An Economic Analysis of the Plaintiff's Windfall from Punitive Damage Litigation*, 105 Harv. L.Rev.1900, 1911 (June 1992).

This theme was expressed and recognized in the proceedings leading to the adoption of subsection .020(j). Thus, one officer of an industry group urging adoption of the tort reform provisions stated: "If the intent of punitive damages is to punish rather than award, it would follow that a portion of punitive damages could be allocated to the state."[37] A representative of the state chamber of commerce, which also advocated passage of the tort reform package, stated: "[T]he fine, or penalty that had been established as punishment, should be awarded to society, not the claimant because the wrongful actions were actually a crime against society."[38] A state representative made the same point:

> [P]unitive damages are really awarded when harm has been done, not just to the individual as it would be compensatory harm, but to the community at large. By putting the punitive damage amounts into the community's coffers, the community in a sense is being made whole. What this does is bring punitives back in to a form of compensatories for the community in total.[39]

Increasing state revenues by allocating a portion of punitive damages awards to the state based on the analogy between such awards and civil and criminal fines is a legitimate public policy choice.

In conclusion, subsection .020(j) is meant to reduce incentives to bring punitive damage claims, increase incentives to settle those claims that are brought prior to trial, and require those claims that are successfully tried to make a contribution to the state general fund. Considering these purposes, individually and in combination, they meet minimum rationality standards.

## C. Equal Protection

The constitutional right to equal protection is a command to state and local governments to treat those who are similarly situated alike. The common question in equal protection cases is whether two groups of people who are treated differently are similarly situated and thus entitled to equal treatment. Equal protection jurisprudence concerns itself largely with the reasons for treating one group differently from another. In reviewing equal protection claims we view the enactment in question as creating, by its differential treatment, separate groups.[40]

Provisions of an act challenged on equal protection grounds that separate different groups are referred to as a "classification."[41] Classifications such as those involved here which relate merely to economic interests are reviewed under Alaska's equal rights clause "by asking whether a legitimate reason for disparate treatment exists, and, given a legitimate reason, whether the enactment creating the classification bears a fair and substantial relationship to that reason."[42]

In the present case Anderson claims that subsection .020(j) creates two pairs of separate categories. The first pairing divides those litigants with punitive damages claims who litigate their cases to judgment from those litigants with punitive damages claims who settle their cases. The second pairing separates plaintiffs having civil tort claims,

**37.** House Judiciary Standing Comm., 20th Leg., Feb. 24, 1997, No. 115 (Alaska) (statement of John Wheately, Vice–President of Policy Support Indus. Alliance).

**38.** House Judiciary Standing Comm., 20th Leg., Feb. 24, 1997, No.1967 (Alaska) (statement of Pamela Labolle, President of Alaska State Chamber of Commerce).

**39.** House Judiciary Standing Comm., 20th Leg., Feb. 27, 1997, No. 1260 (Alaska) (statement of Rep. Ethan Berkowitz).

**40.** *Gonzales v. Safeway Stores, Inc.*, 882 P.2d 389, 396 (Alaska 1994).

**41.** *Id.* at 396.

**42.** *Id.* The test under the federal equal protection clause is similar, but less demanding. *See Isakson v. Rickey*, 550 P.2d 359, 362 (Alaska 1976) (establishing that rational basis review under the Alaska Constitution is more rigorous than that under the federal constitution). Thus economic classifications that are constitutional under Alaska's provision are necessarily constitutional under the equal protection clause of the Fourteenth Amendment.

all of whom are subject to subsection .020(j), from plaintiffs having claims arising in admiralty, whose claims are excluded from coverage by section 1 of the tort reform legislation.[43]

The first pairing—concerning the disparate treatment of those who take their case to judgment as distinguished from those who settle—is based on a legitimate reason: encouraging settlements. Settlements decrease the length, complexity, and expense of litigation. This subsection is fairly designed to encourage settlements, for it offers a considerable financial incentive by allowing the punitive damage claimant to keep the whole amount of punitive damages reached through settlement.[44]

■ Concerning the second pairing, separating civil from admiralty claimants, an obvious immediate objective was to avoid impairing the $5 billion punitive damages verdict in the federal *[In re] Exxon Valdez,* [270 F.3d 1215 (2001)] litigation. But the state also offers a more general reason: admiralty claims are governed by federal statutes and federal common law. The role that state legislation can play in influencing substantive admiralty law is limited. As the superior court recognized, this in itself justifies the exclusion of admiralty claims:

> State courts exercising concurrent maritime jurisdiction are generally bound to apply substantive federal maritime law. Thus, whether in state court or in federal court, maritime law determines the rights of the parties. "[A] state court 'may adopt such remedies, and attach to them such incidents as it sees fit' so long as they do not attempt to make changes in the 'substantive maritime law.' " That proviso is violated when the state remedy "works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and unifor-

mity of that law in its international and interstate relations."

The Act's statement of legislative intent which treats admiralty claims differently than all other tort claims is a statement of substantive state law. When the law allows plaintiffs 100% of the punitive damages verdict it results in plaintiffs in admiralty being treated differently than other Alaska plaintiffs. However, the Legislature's "classification" bears a fair and substantial relationship to attaining a legitimate government objective. The rationale for the prevailing rule that regardless of the forum federal substantive law applies to a general admiralty cause of action is the perceived need for uniformity in maritime tort law, regardless of the place of injury or forum of trial. (Citations omitted.)

In *State, Department of Public Safety v. Brown,*[45] we held that the exclusive remedy defense contained in the Alaska Workers' Compensation Act could not deprive a seaman who had collected state workers' compensation of a Jones Act admiralty remedy against his employer. We observed that this result was in accordance with a number of similar holdings in the federal circuits[46] and with the United States Supreme Court's decision in an analogous situation in *Pope & Talbot, Inc. v. Hawn,*[47] where

> the court refused to apply a state contributory negligence defense which would have barred recovery for a general maritime cause of action. The court stated that "[w]hile states may sometimes supplement federal maritime policies, a state may not deprive a person of any substantial admiralty rights as defined in controlling acts of Congress or by interpretative decisions of this Court." To hold otherwise would undermine the uniformity of maritime law "which the [Federal] Constitution has placed under national purview to control in

---

**43.** Ch. 26, § 1(11), SLA 1997 provides in relevant part: "it is the specific intent of the legislature that this Act not apply to or any way have an effect on *In Re Exxon Valdez,* A89–0095 Civ. (D.Alaska) or any other federal admiralty action now or in the future."

**44.** *See supra* note 33.

**45.** 794 P.2d 108, 110–11 (Alaska 1990).

**46.** *Id.*

**47.** 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953).

'its substantial as well as procedural features.' "[48]

This is not the occasion to rule on whether application of subsection .020(j) in an admiralty case would necessarily be preempted. That question is not presented. The current analytical framework for deciding admiralty preemption questions is set out in the Ninth Circuit's recent decision in *In re Exxon Valdez*.[49] The framework is complex, and what the result would be if it were applied to subsection .020(j) may be uncertain. It is enough now to conclude that the primacy of federal law and the need for uniformity in admiralty are legitimate justifications for excluding admiralty claims from the coverage of subsection .020(j).

## II.

**Pro–Rata Attorney's Fees Should Be Deducted from the State's Fifty Percent.**

■ Anderson's attorney's fee contract provided that her attorneys would be paid a contingent fee of forty percent of punitive damages. The state argued before the superior court and argues on appeal that its half of the $600,000 punitive award should not be subject to a corresponding reduction to pay a portion of Anderson's attorney's contingent fee. The superior court disagreed and deducted from the state's $300,000 share the sum of $120,000, thus applying the forty percent contingent fee percentage. I conclude that the superior court was correct.

Two statutory sections are relevant to this issue. The first is AS 09.17.020(j), which mandates that "fifty percent of the award [of punitive damages] be deposited into the general fund of the state." The other is AS 09.60.080, which provides:

If an attorney contracts for or collects a contingency fee in connection with an action for personal injury, death, or property damage and the damages awarded by the Court or jury include an award of punitive damages, the contingent fee due the attorney shall be calculated before that portion of punitive damages due to the state under AS 09.17.020(j) has been deducted from the total award of damages.

The state argues that AS 09.60.080 speaks only to the calculation of attorney's fees, not to their deduction from that portion of the punitive damage award payable to the state. It contends therefore that section .080 has no bearing on the question of deduction of fees and that since the word "award" is not modified in subsection .020(j) the legislature meant there to be no deduction for fees from the state's portion.

Although the state's argument is correct that section .080 only directly addresses calculation, I believe that section .080 implies that half of the calculated fee should be deducted from the portion of damages due the state. Section .080 clearly is concerned with *when* the calculation of fees takes place, yet timing of the calculation is unimportant unless a deduction is meant to occur. Otherwise calculation of fees would be just as appropriate after the state's portion was deducted, so long as it was clear that the fees should be based on the entirety of the award. Further, if section .080 means that no deduction for fees can be taken from the state's share, its purpose would be to ensure full compensation of plaintiffs' attorneys while imposing a double burden on their clients.[50] This seems like an unlikely objective.

The state also argues that legislative history supports its view. But legislative history presented by the state persuasively supports an intent to deduct fees from the state's portion of punitive damages. An early version of the bill that became the Tort Reform Act of 1997 provided that "the contingent fee due the attorney shall be calculated *after* that portion of punitive damages due the state under [AS 09.17.020(j)] has been deducted

---

48. *Brown*, 794 P.2d at 111 (citations omitted).

49. 270 F.3d 1215, 1250–53 (9th Cir.2001).

50. To use this case as an example, the $600,000 punitive damages award would be allocated as follows under the state's position: the state would receive $300,000, Anderson's attorneys would receive $240,000, and Anderson would receive $60,000. Under the superior court's construction of the statute, the state receives $180,000, Anderson's attorneys receive $240,000, and Anderson receives $180,000.

from the total award of damages." [51] Under this language, it seems that no deduction for contingent attorney's fees would be permitted from the state's portion of a punitive damages award, and the contingent fee percentage would be applied only to the portion of punitive damages left to the plaintiff after the state's portion had been deducted. But the word "after" was changed to "before" in floor amendments in the Senate.[52] Although no specific discussion of this amendment has been presented to us, the only reasonable explanation for the change is that it was meant to require the state to pay its share of a plaintiff's attorney's contingent fee. This is also how the attorney's fee provision of the Tort Reform Act was explained by the Attorney General to the Governor at the time the Tort Reform Act was debated and passed:

> An allocation to the state of fifty percent of the punitive damage award also does not appear to violate state or federal constitutional provisions. *The allocation would be made after fees are paid to plaintiff's counsel.* This avoids substantive due process problems that might arise if the plaintiff were exposed to liability for contingency fees after allocation to the state general fund.[53] (Emphasis added.)

The state argues that actions taken by the legislature in rejecting a comprehensive amendment to the bill that became the Tort Reform Act indicate an intent to reject the pro-rata reduction of fees from the state's portion of punitive damages. The amendment, referred to in the Senate as Amendment No. 11, had numerous provisions.[54] Among them were provisions changing the state's straight fifty percent share to a grad-

uating schedule under which the state would receive nothing from the first million dollars of any punitive damages award to a recovery of forty percent of any award in excess of $10 million.[55] Although the exact language of the amendment has not been presented, the notation concerning its effect on attorney's fees is "[a]ll amounts to the state after payment of all costs and fees incurred in connection with securing the award." [56] The legislature rejected the Amendment No. 11 package,[57] doing so in the Senate before the amendment changing "before" to "after" in what became subsection .020(j).[58] Because Amendment No. 11 covered many subjects, no inference of a legislative intention to prevent pro-rata reduction of attorney's fees from the state's portion of punitive damages can reasonably be drawn from its rejection.

A package similar to Amendment No. 11 was offered in the House of Representatives.[59] It was rejected by the House, and Majority Leader Brian Porter wrote a memo concerning the reasons for its rejection, stating that it "was determined to be unacceptable in the main, because its punitive damages section ... removed the disincentive to settle found in returning a full 50 percent of these fines to the state." [60] The state argues that Representative Porter's language referencing "a full fifty percent of these fines" is a reference to an intent not to permit a deduction for attorney's fees. Although this is possible, it seems more likely that the reference is to the fact that under the amendment the state would only receive a graduated percentage of punitive damages awards, up to forty percent for awards greater than $10 million, rather

---

51. Sponsor Substitute for House Bill (S.S.H.B.) 58, § 34, 20th Leg. 1st Sess. (Feb. 17, 1997).

52. 1997 Senate Journal 1297–1303.

53. 1997 Op. Att'y Gen. No. 27, 1997 WL 1089558, *6 (Alaska A.G.) (April 23, 1997) (citations omitted).

54. 1997 Senate Journal 1249–50. *See also* House Bill (H.B.) 58 Proposed Resolution Package, April 13, 1997.

55. 1997 Senate Journal 1249–50. *See also* H.B. 58 Proposed Resolution Package, April 13, 1997, pg. 2.

56. 1997 Senate Journal 1249–50. *See also* H.B. 58 Proposed Resolution Package, April 13, 1997, pg. 3.

57. 1997 Senate Journal 1249–50.

58. S.S.H.B. 58, § 34, 20th Leg. 1st Sess. (Feb. 17, 1997).

59. H.B. 58 Proposed Resolution Package, April 13, 1997.

60. Memorandum from Rep. Brian Porter, House Majority Leader, to Senator Tim Kelly, Senate Rules Chairman (April 16, 1997).

than fifty percent of any punitive damages award no matter what its size.

■ The state also argues that allowing a pro-rata reduction for a contingent fee permits the possibility of severe diminishment or elimination of the state's recovery rights because a plaintiff might agree "to pay a higher percentage (up to 100 percent) of the punitive damages award as a contingency fee." This highlights a possible area of abuse. Ordinarily, however, the interest of the client should be enough to keep contingent fees reasonable. But if in a particular case a contingent fee contract provides for an unreasonably or disproportionately high percentage for punitive damages, the inherent power of the court to regulate contingent fee contracts can be invoked to correct the problem.[61] In the present case no contention is made that the fee is objectionable on these grounds.

For the above reasons the superior court did not err in deducting forty percent in fees from the state's portion of the punitive damages award.

### III.

**The State Should Be Given Credit for the Enhanced Fee Awarded to Anderson under Civil Rule 68.**

Civil Rule 68 provides for enhanced fees when an offer of judgment is made prior to trial and the judgment finally rendered is less favorable to the offeree than the offer. Rule 68 was applied in Anderson's case and she received a fee award against the association and Merculief for the substantial sum of $228,882.75. The state argued before the superior court that it should receive some

benefit from this award, assuming that its portion of the punitive damage award was subject to a reduction for attorney's fees. The superior court rejected this contention.

The state's argument is that it "will be paying a substantial portion of Anderson's attorney's fees that are then being reimbursed, at least in part, by the award of enhanced fees. . . ." The state thus seeks a pro-rata reduction in the fees that it must pay to Anderson's attorney under the contingent fee contract.

I believe that the state is correct in this argument. The contingent fee that is to be deducted from the state's portion of the punitive damages award should be the actual percentage paid by the plaintiff as attorney's fees. When the plaintiff receives a substantial award of attorney's fees from the defendant, the actual percentage of fees that she must pay becomes lower than the percentage stated in the contingent fee contract. It seems correct that the state should have to pay no more than the effective rate for fees paid by the plaintiff, as distinct from the contractually stated fee.

I therefore would remand this aspect of the case to the superior court to determine the effective rate of the contingent fee that Anderson must pay and to apply that rate to the state's portion of the punitive damages award.[62]

BRYNER, Justice, with whom CARPENETI, Justice, joins, concurring and dissenting.

I join in Part II of Justice Matthews's opinion, which holds that AS 09.60.080 re-

---

**61.** See, e.g., International Bhd. of Elec. Workers Local Union 1547 v. Lindgren, 985 P.2d 451, 457 (Alaska 1999) ("contingent fees must pass the test of reasonableness"); see also Alaska R. Prof. Cond. 1.5.

**62.** Calculation of the effective fee can be complicated by the fact that it is common under contingent fee contracts to apply the percentage of recovery stated in the contract to awards of fees. Thus in this case if the forty percent rate is applied to the $228,882 Rule 68 award, the net benefit received by Anderson will be six-tenths of the stated amount or $137,329. This can be factored into the calculation of her effective con-

tingent fee in the following manner assuming a $100,000 compensatory award in addition to the $600,000 punitive damages award that she received. From the total judgment ($700,000), calculate the total fees that she would have to pay, except for the award of attorney's fees (here $280,000). Subtract the net benefit of the award of attorney's fees from total fees ($280,000 less $137,329) to get actual fees of $142,671. Her effective contingent fee percentage is then calculated by dividing actual fees ($142,671) by the total award ($700,000), resulting in an effective fee percentage that, applying our assumptions, is just over twenty percent.

quired the state's fifty-percent share of punitive damages under AS 09.17.020(j) to be determined after deducting the contingent fee due Anderson's attorney from the total amount of her punitive damages award. I write separately here to address the remaining issues: whether AS 09.17.020(j) is constitutional and whether the state was entitled to a share of Anderson's prevailing-party fee award.

## I. Constitutional Issues

The takings-clause and due-process issues raised in this appeal mirror the issues addressed in our evenly divided opinion in *Evans v. State*.[1] I adhere to my dissenting opinion in *Evans*[2] and see no need to repeat my views here. My comments below address new points advanced in today's dispositional opinion.

### A. Takings

The dispositional opinion reasons that AS 09.17.020(j) avoids takings-clause problems because it merely redefines a plaintiff's cause of action for punitive damages before it accrues: "[A]s the state points out, unlitigated claims only become property when they accrue, and a claim cannot accrue before the events that give rise to it occur."[3] Because Anderson's punitive damages claim accrued after subsection .020(j) was enacted, the opinion concludes, AS 09.17.020(j) took no vested property interest from Anderson.

But as my dissent in *Evans* points out, AS 09.17.020(j) neither redefines nor regulates the permissible scope of unlitigated punitive damages claims; instead, subsection .020(j) attempts to alter the plaintiff's property rights only after the plaintiff's claim accrues and is fully litigated, after the claim proves successful, and after the plaintiff *"receives an award."*[4] In fact, the statute unequivocally disclaims any intent to assign the state an interest in unaccrued and unlitigated claims, expressly stating that it "does not grant the state the right to file or join a civil action to recover punitive damages."[5]

Subsection .020(j)'s attempt to divest plaintiffs of property after they litigate their claims and receive their awards effectively takes the fruits of their labor,[6] which readily distinguishes this statute from a provision that would give the state a share of unaccrued and unlitigated claims.

### B. Substantive Due Process

My dissent in *Evans* discussed two supposed justifications for AS 09.17.020(j) and concluded that the statute's forfeiture provision violates substantive due process because it serves no rational purpose.[7] The dispositional opinion offers two refined justifications for the statute, but in my view neither withstands rational basis scrutiny.

The first proposed justification posits that subsection .020(j) might offer "incentives" to

---

**1.** *Evans ex rel. Kutch v. State,* 56 P.3d 1046 (Alaska 2002).

**2.** *Id.* at 1075–79 (Bryner, Justice, dissenting).

**3.** Maj. Op. at 714.

**4.** AS 09.17.020(j) (emphasis added); *see Evans,* 56 P.3d at 1077 (Bryner, Justice, dissenting):

By specifying the source of forfeiture as "the award" and by defining an award to be both something that "a person receives" and something that can be "deposited into the general fund," [subsection .020(j)'s] language unequivocally contemplates a transfer of funds to the state that will occur only when the defendant becomes obliged to make actual payment to the plaintiff—an event that necessarily follows entry of judgment in the plaintiff's favor.

**5.** AS 09.17.020(j).

**6.** *Cf. DeLisio v. Alaska Superior Court,* 740 P.2d 437, 440 (Alaska 1987) (citing *Coffeyville Vitrified Brick & Tile v. Perry,* 69 Kan. 297, 76 P. 848, 850 (1904)) (recognizing that labor is property under the takings clause). And in any event, the dispositional opinion's unlitigated-claim rationale fails to explain how a jury award to the plaintiff can morph into a judgment for the state without becoming an unconstitutional taking of the *defendant's* property when the state is not a party to the proceedings that produce the award and the defendant has no opportunity to defend against the state's claim to the property. *See Evans,* 56 P.3d at 1077–78. After all, we have previously recognized that even when a statute commands civil forfeiture of property whose owner engages in criminal conduct, due process requires notice to the owner and an opportunity to defend against the state's claim to the property. *See, e.g., Waiste v. State,* 10 P.3d 1141, 1145 (Alaska 2000).

**7.** *Evans,* 56 P.3d at 1075–76.

reduce punitive damages claims and promote settlements.[8] Yet as the *Evans* dissent points out, the only way that subsection (j) discourages punitive damages claims is by punishing any claimant who files a meritorious claim, successfully pursues it to completion, and receives a factually accurate and lawfully authorized judgment.[9] Because any tendency that the statute might have to discourage abuse of the law emerges purely as a side effect of its direct command to punish all punitive damages claimants who successfully exercise their constitutional right to due process, its "incentives" are perverse and irrational.[10] Incentives of this kind fail to meet even the minimal test of substantive due process.[11]

As a second justification, the dispositional opinion proposes that subsection .020(j) increases state revenues.[12] But surely the state's unquenchable thirst for money does not by itself justify snatching a private litigant's purse. Just as cost savings alone do not sustain otherwise arbitrary state action,[13] so revenue earning is not, in itself, a legitimate legislative purpose.[14] Although the dispositional opinion suggests that the state

does have a valid interest-apart from pure revenue generation-in taking a share of privately won punitive damages judgments,[15] I think that the dissent in *Evans* adequately addresses this notion and correctly rejects it as unfounded.[16]

## II. State's Right to Share in Anderson's Fee Award

■ As its final point, the state briefly argues, without citing any authority, that the trial court should have awarded it a portion of Anderson's prevailing-party attorney's fee award. The state reasons that "if the allocation statutes are to be interpreted to require the payment of attorney's fees by the State, then they should also be interpreted to permit the State to recover a portion of the attorney's fees award, particularly where there is an enhanced award ... [under Civil Rule 68] of actual fees as in this case."

But our interpretation of AS 09.60.080 does not "require the payment of attorney's fees by the State." As we recognize in Part II of Justice Matthews's opinion, AS 09.60.080 sets out a specific formula for calculating the

8. Maj. Op. at 715–16.

9. *See Evans*, 56 P.3d at 1076:
Because the state receives its fifty-percent share of punitive damages under AS 09.17.020(j) only if the jury's award of punitive damages withstands scrutiny by the trial judge and is upheld on appeal, the actual source of forfeiture under the statute will *always* consist of punitive damages that have been conclusively established to be factually and legally justified. While purporting to target frivolous and excessive claims, then, the forfeiture statute paradoxically does just the opposite: it attacks only meritorious judgments, supposedly deterring abusers of the punitive damages system solely by punishing legitimate users. As a deterrent to frivolous claims, then, this regime is worse than irrational; it is perverse.

10. *Id.*

11. Moreover, the dispositional opinion's promise of early settlements seems wholly speculative and unrealistic. As vividly illustrated by today's case-where the *defendants* rejected a reasonable pretrial settlement offer in favor of pressing a defense that the jury found meritless—there is no rational basis to predict, on the whole, that AS 09.17.020(j) will encourage more flexibility by plaintiffs than intransigence on the part of defendants.

12. Maj. Op. at 716.

13. *See, e.g., Herrick's Aero–Auto–Aqua Repair Serv. v. State, Dep't of Transp. & Pub. Facilities*, 754 P.2d 1111, 1114 (Alaska 1988) (finding under equal protection analysis that cost savings, without more, cannot justify selective enforcement of state regulations).

14. Of course raising revenues through taxation is undeniably a legitimate power that our constitution gives to state government. *See* Alaska Const., art. IX, § 1. And in certain respects, AS 09.17.020(j) arguably has the effect of a tax on punitive damages. Nevertheless, the statute does not create a tax and so is not governed by the constitutional constraints that define the state's power of taxation. *See* Alaska Const., art. IX, §§ 2–4. Since the fact that the state might have power to achieve a result through lawful means cannot justify its efforts to achieve a similar result through unlawful action, the state's ability here to raise comparable revenues through a properly enacted tax on punitive damages affords no shelter to AS 09.17.020(j).

15. Maj. Op. at 716–17.

16. *See Evans*, 56 P.3d at 1078–79.

state's share of a plaintiff's punitive damages award in contingent-fee cases. The statute's plain language fixes that share at fifty percent of the plaintiff's net punitive damages award after applying the terms of the contingent-fee agreement. By specifying this exclusive method of calculation, AS 09.60.080 simply defines the state's share of a plaintiff's punitive damages in contingent-fee cases. The statute imputes no payment of fees to the state and allows no other adjustment.

This straightforward interpretation of AS 09.60.080 also squares with the plain language of AS 09.17.020(j), the provision that establishes the state's right to share in private awards of punitive damages. Subsection .020(j) specifically allocates to the state a share from the plaintiff's "award of punitive damages," thus implicitly denying the state access to any other part of the judgment— whether directly or by offset. At the same time, subsection .020(j) explicitly denies the state any right to participate as a party in the punitive damages action.[17] Because the state consequently shares none of the ordinary risks and benefits of a party, subsection .020(j) undercuts the theory that AS 09.60.080 envisions a state contribution of fees that would entitle the state to an offset.[18]

And in actuality, of course, the state pays no real or constructive fees; only the plaintiff pays. Under AS 09.17.020(j)'s provisions creating the state's interest in punitive damages and AS 09.60.080's provisions defining that interest, the state acquires its property interest only after the plaintiff's contingent fee is calculated and paid. Because the state

has no property interest in a plaintiff's award of punitive damages until the plaintiff's contingent fees are calculated and deducted as required in AS 09.60.080, the state can lose nothing before its share of the punitive damages award is fixed under that statute.[19] Accordingly, there is no realistic basis for treating the state's share of damages under section .080 as if it were the remnant of some larger, preexisting property right that has been cut down by a forced contribution to the plaintiff's payment of contingent fees. Simply put, the state cannot lose property before it acquires property; and here, section .080 defines the state's complete property right.

Because AS 09.60.080's definition of the state's share of punitive damages in contingent-fee cases implies no state payment of plaintiff's fees, the superior court correctly denied the state's claim for an offset from Anderson's fee award under Civil Rule 68.

---

**17.** *See* AS 09.17.020(j) ("This subsection [establishing the fifty-percent punitive damages forfeiture] does not grant the state the right to file or join a civil action to recover punitive damages.").

**18.** Even if the language of these statutes were ambiguous, we would be obliged to construe them narrowly, in favor of Anderson since we have long held that statutes in derogation of the common law should be construed narrowly so as to effect the least possible change in the common law. *University of Alaska v. Shanti*, 835 P.2d 1225, 1228 n. 5 (Alaska 1992) (citing *Hugo v. City of Fairbanks*, 658 P.2d 155, 161 (Alaska App. 1983) and *Monteville v. Terrebonne Par. Con. Gov't*, 567 So.2d 1097, 1100 (La.1990)). Before the legislature enacted AS 09.17.020(j), Alaska common law allowed plaintiffs to recover puni-

tive damages without contributing any share of their awards to the state. *See, e.g., Veco, Inc. v. Rosebrock*, 970 P.2d 906, 922 (Alaska 1999) (quoting *Bridges v. Alaska Hous. Auth.*, 375 P.2d 696, 702 (Alaska 1962)). Because AS 09.17.020(j) unquestionably abridges the common law, it must be interpreted narrowly.

**19.** For example, if these statutes gave the state an unspecified share of all punitive damages awards, the state would have no better ground to claim fifty percent of a plaintiff's gross punitive damages award than it would to claim fifty percent of the net award—nothing in the law otherwise grants the state a better claim to one share than the other, and, since it is not a party to the action, the state would have done nothing to earn either. *See* AS 09.17.020(j).